# THE STATE OF NEVADA, Respondent, *v.* CLIFFORD DUANE HELM, Appellant.

No. 3530

August 11, 1949. 209 P.2d 187.

*Gordon W. Rice,* of Reno, *Leo A. McNamee, G. William Coulthard* and *Taylor & Gubler,* all of Las Vegas, for Appellant.

*Alan Bible,* Attorney General, *Geo. P. Annand* and *Homer Mooney,* Deputy Attorneys General, *Robert E. Jones,* District Attorney, *A. W. Ham, Jr.* and *Roger D. Foley,* Deputy District Attorneys, Las Vegas, for Respondent.

## OPINION

By the Court, HATTON, District Judge:

Clifford Duane Helm, the defendant below, is the appellant here. He will be referred to herein as the defendant.

The defendant was charged with the murder of one Frank Ferroni, Jr., also known as John Beasley, in an Information filed by the district attorney of Clark County, Nevada, on March 27, 1947, to which he, on April 16, 1947, entered his plea of not guilty. On June 2, 1947, the impaneling of the jury began, the information was read to the prospective jurors, and the impaneling proceeded to the point where the state and the defendant entered upon the exercising of their peremptory challenges. The defendant passed his third, fourth, and fifth peremptory challenges. Then, with the twelve jurors in the box remaining the same as upon the passing of his fifth peremptory challenge, his counsel asked

leave to exercise his sixth peremptory challenge, by challenging one Robinson, which request the trial judge refused to grant, and to which ruling the defendant excepted. The jury were then sworn to try the cause, the Information was read by the clerk, and the plea stated, and the district attorney made his opening statement. The court then recessed to the following day, when the trial was resumed. Immediately upon the resumption of the trial, the trial judge stated his opinion that he had erred on the previous day in refusing to allow the defendant to exercise his six peremptory challenge, and stated that he would declare a mistrial unless the parties accepted the jury. Defendant's counsel stated that he would stand on the record, and was unwilling to accept the jury except upon the conditions as shown by the record. He neither specifically consented nor objected to the discharge of the jury. The court then declared a mistrial, and dismissed the jury. The trial of the case was reset for September 15, 1947. On that date, the defendant applied for leave to withdraw his plea of not guilty and substitute a plea, in writing, of once in jeopardy and asking for his discharge, which application was refused by the court. The defendant, however, was allowed to file his said plea of once in jeopardy. The trial was then proceeded with, and resulted in a verdict of guilty of murder of the first degree, the punishment being fixed at life imprisonment.

The first alleged error assigned and discussed in the briefs is that the trial court erred in denying the defendant's plea of once in jeopardy.

■ Upon the authority of the case of State v. Pritchard, 15 Nev. 74, it is clear that the court erred in refusing to allow the defendant to exercise his sixth peremptory challenge, and that a verdict of guilty upon a trial before the jurors then in the jury box would have been set aside on appeal to this court. The question arises as to whether or not the defendant had already suffered a prior jeopardy when he was brought to trial on September 15, 1947.

■■ The subject of prior jeopardy was before this court in the case of Ex parte Maxwell, 11 Nev. 428. In that case the jury had failed to agree on a verdict, and were dismissed without a determination by the court, ·on the record, of the grounds for such dismissal, and it was held that, in the absence of such determination, prior jeopardy was shown. In the opinion in the Maxwell case the following statements appear:

"Although there still exists some conflict and confusion in the opinion of judges upon this question, the rule now seems to be pretty well settled in the American courts that ·whenever the accused has been placed upon trial, upon a valid indictment, before a competent court, and a jury duly impaneled, sworn and charged with the case, he has then reached the jeopardy, from the repetition of which this constitutional provision protects him.

  *   *   *   *   *   *   *

"Bishop, in his treatise on criminal law, after an elaborate review of the authorities and a discussion of the whole subject says: 'The better view of this whole question may be stated as follows: Whenever a trial has commenced whether for misdemeanor or felony [and] the judge discovers any imperfection which will render a verdict against the defendant either void or voidable by him, he may stop the trial, and what has been done will be no impediment in the way of any future proceedings.'

  *   *   *   *   *   *   *

"In other words, when the record shows an actual jeopardy to have taken place against the defendant, he is protected thereby from further peril for the alleged offense. But where the record shows also matters disproving the peril, it does not show the peril, whatever else it shows, and therefore it does not protect him."

In the later edition of the work referred to, Bishop's New Criminal Law, Vol. 1, p. 622, the author adds: "Then, the prima facie jeopardy appearing of record, matter nullifying it will also appear, and the defendant will be properly held for further proceedings."

At page 623 the author states: "If, after the trial has commenced, a juror is discovered to have been insufficiently sworn, or to be insane, or not of the panel, or from any other cause incompetent, he may be discharged or the error corrected otherwise without entitling the prisoner to go free. Some state the rule to be that anything discovered in a juror showing him not to be a proper one to sit in the case will work this result. But the better form of the doctrine is that the matter must be such as the defendant can make ground for a new trial if the verdict is against him."

■ It is shown, on the record in this case, that the jury above referred to was never duly, or legally, impaneled. We therefore conclude that the defendant's abortive trial before that jury was not attended with jeopardy or peril of a legal conviction, and we must decide that the trial court did not err in denying the defendant's plea of once in jeopardy.

The defendant contends that the first jury was discharged without such necessity as the law recognized as legally sufficient, and that hence its discharge was equivalent to his acquittal. The authorities quoted from above support the view that there was presented to the trial court, in the present case, a necessity for the discharge of the jury, which necessity was both manifest and overruling. The American cases hold generally that the determining of such necessity lies in the discretion of the trial court upon a consideration of all of the circumstances of the case. 22 C.J.S.; Criminal Law, sec. 258, page 394. In the present case, the court could either have proceeded with the trial knowing that the judicial machinery was legally defective and that a verdict of guilty would be set aside by this court on appeal, or the trial judge could declare a mistrial and begin anew. We regard it as clear that the ends of public justice demanded the latter course.

In the case of Thompson v. U. S., 1894, 155 U.S. 271, 15 S.Ct. 73, 74, 39 L.Ed. 146, the supreme court of the

United States considered and passed upon a case similar to the one presented here. In that case, after the jury was sworn and the trial was proceeding, the fact that one of the jurors was disqualified, by having been a member of the grand jury that found the indictment, became known to the court. Thereupon the court, without the consent of the defendant and under exception, discharged and ordered a new trial. The defendant pleaded once in jeopardy, and the supreme court, in holding that no jeopardy had attached, said: "As to the question raised by the plea of former jeopardy, it is sufficiently answered by citing U. S. v. Perez, 9 Wheat. 579 [22 U.S. 579, 6 L.Ed. 165]; Simmons v. U. S., 142 U.S. 148, 12 S.Ct. 171, [35 L.Ed. 968], and Logan v. United States, 144 U.S. 263, 12 S.Ct. 617, [36 L.Ed. 429]. Those cases clearly establish the law of this court that courts of justice are invested with the authority to discharge a jury from giving any verdict whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated, and to order a trial by another jury; and that the defendant is not thereby twice put in jeopardy within the meaning of the fifth amendment to the constitution of the United States."

As late as April 25, 1949, that high tribunal refused to adopt a formula "inconsistent with the guiding principles of the Perez decision to which we adhere." Continuing, the court said: "Those principles command courts in considering whether a trial should be terminated without judgment to take 'all circumstances into account' and thereby forbid the mechanical application of an abstract formula. The value of the Perez principles thus lies in their capacity for informed application under widely different circumstances, without injury to defendants or to the public interest." Wade v. Hunter, 1948, 336 U.S. 684, 69 S.Ct. 834, 838.

The American Law Institute, after several years of

study of the authorities on this subject, adopted the following rule: "Sec. 7. Discharge of Jury—effect of. If during the trial of a person for an offense the jury is discharged before verdict rendered because it is impossible to proceed with the trial, or to proceed without manifest injustice to the defendant or to the state, or the defendant consents to or otherwise waives his right to object to such discharge, the defendant may be again prosecuted for the same offense."

Upon the foregoing authorities, this court holds that the discharge of the first jury was upon grounds legally sufficient, and did not constitute an acquittal of the defendant.

In the principal cases relied on by defendant, it appears that the trial had commenced, before a jury legally impaneled and sworn, before the declaring of a mistrial, and that a mistrial was declared for a legally insufficient season. This distinguishes the cases referred to from the one presented here, in which the first jury was not legally impaneled.

In People v. Young, 100 Cal.App. 18, 279 P. 824, cited by defendant, after the jury had been legally impaneled and sworn, the court allowed the state to exercise a peremptory challenge, the juror so challenged was dismissed and a new juror substituted. A plea of second jeopardy was denied by the court. The supreme court held that, under California law, a peremptory challenge may not be exercised after the jury has been duly impaneled and sworn, that no disqualification on the part of the challenged juror was shown, and that the accused had suffered a prior jeopardy before the jury as originally impaneled. The case affords no guidance in the present case. The same is true of the case of Jackson v. Superior Court, 10 Cal.2d 350, 74 P.2d 243, 113 A.L.R. 1422. There it was held that the defendants were placed in jeopardy when a jury was impaneled and sworn and a mistrial was declared immediately thereafter, over

defendants' objections, because of an error in impaneling the jury, which error would not have been regarded as warranting the setting aside of a conviction, and which was waived by the defendants. Unlike the Jackson case, the case presented here shows that the first jury was not legally impaneled, and that a conviction by it would have been set aside on appeal.

In Hilands v. Commonwealth, 1886, 111 Pa. 1, 2 A. 70, 72, 56 Am.Rep. 235, after the jury had been legally impaneled and sworn, the court allowed a juror to go to his home on account of sickness in his family. This was done with the consent of the accused. The trial judge, believing that he had erred, discharged the jury. The defendant's plea of prior jeopardy was overruled. In reversing the judgment of conviction, the supreme court held that the trial court, of its own will and action, had discharged the jury after it had been duly impaneled and sworn and after the attaching of jeopardy. The court further stated that it could not find that the first jury was discharged "under such extreme and overwhelming necessity as to subject the prisoner to be again put in jeopardy."

Also in the case of Oliveros v. State, 120 Ga. 237, 47 S.E. 627, 1 Ann.Cas. 114, as in the three cases last referred, to the trial was proceeding before a jury legally impaneled and sworn. The alleged error for which a mistrial was declared was in the admission in evidence of a certain receipt, and the oral comment of the judge as to its effect and weight as evidence, which comment the trial court believed to be contrary to the statute. Upon trial before another jury prior jeopardy appeared by reason of the fact that the first jury was legally impaneled and sworn. The Georgia court held that, under these circumstances, such jeopardy could not be nullified by a dismissal of the jury for the error shown, if it was error. The chief justice expressed the opinion that error had not occurred.

We have examined other cases cited by the defendant, but they have not been found sufficiently applicable and persuasive to change the views above expressed.

As his second assignment of error, the defendant avers that the trial court erred in sustaining respondent's objection to defendant's offer to prove certain specific acts of violence committed by the deceased on other persons and personally known to defendant prior to the homicide involved in this case.

At the time of the homicide, the defendant and Ferroni were employed in the Las Vegas Club, a gaming casino. They had been acquainted for a number of years, and had worked and travelled together. Defendant had been directed by one of their employers, Mr. Flournoy, to arrange with Ferroni for his departure from Las Vegas, and had been furnished with the sum of $100 to purchase, for Ferroni, a ticket for transportation to New York City and for his expenses en route. Defendant testified, "I told Mr. Flournoy at the time he gave me the money that Mr. Beasley (Ferroni) didn't want to go by Salt Lake City and that way; that he wanted the cash to go to Kingman, Arizona, to go from Kingman, Arizona, and Mr. Flournoy instructed me to buy his ticket to Salt Lake and see that he got on the train." The testimony showed that the defendant and Ferroni met in the boiler room at the rear of the casino, and there had an argument over the plan referred to. Defendant, as a special police officer, was armed with a pistol. A pocket knife was later found on the floor of the boiler room. No weapon was found on the deceased. Defendant testified that, in the quarrel which ensued between them, Ferroni thrust toward him with a knife held in his right hand, that they grapled and struggled about the boiler room, during which time defendant shot Ferroni at least once, and the struggle continued; that he struck Ferroni over the head with the gun, the latter going down on his knees, and defendant on one knee. The testimony further tended to show that the witness Ceas, a special police officer in the casino, heard two or three shots,

and then went through the hallway from the casino to the boiler room, and opened the door thereto, at which moment Ferroni emerged through the door and into the hallway; that, at the same time, the defendant, from within the boiler room, called to Ceas to intercept Ferroni and not let him get away; that Ceas took hold of Ferroni and held him with the latter's head over a table in the hallway and opposite the boiler room doorway; that Ceas ran to call a policeman, and that one or more other persons, who had come upon the scene, endeavored to hold Ferroni, and that the latter moved in the direction of the exit from the hallway into the casino. The witness Schmidt testified that Ferroni said "Don't let him kill me," and that, as the defendant emerged from the boiler room, Fred Merrill, one of his employers, who had come upon the scene, called to defendant "Don't, Cliff." The testimony further tended to prove that defendant, then in the hallway, shot Ferroni in the back of the neck; that Ferroni moved toward the exit from the hallway into the casino; that one or two additional shots were fired by defendant, the last when Ferroni was several feet away from him and moving toward the exit; whereupon Ferroni, after a few steps, fell on the floor and died; that the fatal bullet entered Ferroni's chest three inches above the left nipple and two inches to the left of the midline, and emerged through the right shoulder blade. The witness Takos testified, in substance, that Ferroni, in his progress toward the exit into the casino, and at about the time of the firing of the last shot, turned around; also that Ferroni was "walking when he got the two shots," and that, when he was walking away, his back was turned toward the defendant "just a little bit." The defendant testified that he remembered fighting back up to the steps leading from the boiler room into the hallway, and stumbling over the steps there, and that from then on he could not be positive as to what happened. Ferroni was a considerably heavier and stronger man than defendant.

After his arrest, it was found that the defendant's

necktie and shirt had been cut. The witness McDaniel, an employee of the Federal Bureau of Investigation, testified that he had examined the knife which was found on the boiler room floor, and also the knife taken from the possession of defendant after his arrest, as well as defendant's necktie and shirt referred to, and that he found on defendant's knife bluish-black and also red silk fibres which came either from the defendant's necktie or from a fabric composed of fibres identical with the fibres of the tie; and, also, that he found on said knife certain wool and rayon fibres which came either from the defendant's shirt or a similar fabric. The witness further testified that, on the knife found on the boiler room floor, he found no silk fibres, but that he found white wool fibres of a common character which could have come from defendant's shirt. The microscope slides, showing the original fibres referred to, and photographs thereof, were identified by the witness, and received in evidence.

■ With testimony adduced as above summarized, the trial judge stated that, as he viewed the proofs, no sufficient foundation had been laid in proof of self-defense to justify the admission of evidence of prior acts of violence on the part of the deceased, and he ruled accordingly. In so ruling, we are satisfied that the court did not err. .

In the case of State v. Pearce, 15 Nev. 188, certain witnesses were asked as to their individual knowledge of the character and disposition of the deceased for peace and quietness. Objections to the questions were sustained. No offer was made to prove the general character of the deceased in this respect. In ruling on the subject this court said:

"The proper way of getting at this disposition of his mind is by introducing evidence of his general character founded on his general reputation in the neighborhood where he lives.

"We are, however, satisfied, that no testimony had

been given in the case which authorized the introduction of any evidence in relation to the character of the deceased. The character of the deceased can only be brought in issue where the circumstances are such as to raise a doubt whether the homicide was committed in malice or was prompted by the instinct of self-preservation. It may, in such cases,. always be inquired into, by the defendant, for the purpose of enabling the jury to determine the real motive which actuated the defendant, or the reasonableness of his fears that his own life was in danger. Every case must, in this respect, be gauged with reference to its own sourroundings; for, as is stated by Bishop: 'There can be no general rule on the subject other than the one which rejects the evidence of character and of general bad conduct, except where the foundation for it is specially laid in the facts, real or assumed, of the particular case.' "

In the case of State v. Vaughan, 22 Nev. 285, 39 P. 733, 735, this court said: "Ordinarily, assaults made upon a third person by deceased could only bear upon his general character or disposition, and as to that it is only evidence of general reputation, and not of particular actions, that is admissible."

In the case of State v. Sella, 41 Nev. 113, 168 P. 278, 285, this court said:

"We adhere to the rule which we believe to be supported by the great weight of authority, that the character or reputation of the deceased in homicide cases is to be proven rather by evidence of general reputation of the deceased in the community in which he lived than by particular acts or instances which were not a part of the res gestæ nor connected therewith. * * *

"Neither does the principle to which we adhere come under the general rule that when self-defense is an issue and it is necessary to show the state of mind of the slayer at the time of the commission of the offense, specific acts of violence of the deceased, which are then known to the slayer or have been communicated to him, which tend

to show that the deceased was a violent and dangerous man, may be shown for the purpose of establishing self-defense."

In the Sella case, the question to be determined was as to whether, on the cross-examination of a character witness, he could be questioned as to particular acts of violence perpetrated by the deceased on third persons; which question was answered by the court in the affirmative. Appended to the first paragraph above quoted from the Sella case, this court cited a considerable number of authorities from states which have adhered to a strict rule of exclusion of testimony as to specific acts of violence upon third persons. See, also, 121 A.L.R. annotation, at page 382. In the second paragraph quoted, this court stated that when self-defense is an issue and it is *necessary* to show the state of mind of the slayer, such specific acts of the deceased may be shown. (Italics ours.)

In dealing with this subject, in the case of People v. Soules, 1940, 41 Cal.App.2d 298, 106 P.2d 639, 642, the District Court of Appeal for the third district of California said:

"It is, however, apparent that even if such evidence is competent, under certain circumstances, it should be received with caution for the reason that it is remote, weak, collateral to the real issue, confusing to the jury, unsatisfactory and difficult to rebut. To entitle such evidence to any substantial weight it would be necessary to adduce proof of the circumstances of each previous affray to fairly determine whether the deceased was warranted in acting as he did. For those reasons the great weight of authority holds that evidence of such prior specific acts of violence by the deceased upon other persons is not admissible upon trial of a subsequent offense. It is almost uniformly held that proof of the turbulent, violent and dangerous character of a person, offered for the purpose of concluding therefrom that he

was more likely to have been the aggressor in an affray which resulted in his death, must be established by evidence of his general reputation for peace and quiet in the community where he resides. The same rule is usually applicable to evidence of a violent nature adduced in assault and murder cases to corroborate the defendant in his claim that he acted in necessary self-defense, believing from the circumstances of the particular case, as a reasonable man, that he was about to be assaulted and that he was likely to be killed or to receive great bodily harm. People v. Griner, 124 Cal. 19, 56 P. 625; People v. Henderson, 28 Cal. 465; State v. Sella, 41 Nev. 113, 168 P. 278, 285; 25 Calif.Law Rev. 459, 467; 121 A.L.R. 382, note; 26 Am.Jur. 393, § 347; 13 Cal.Jur. 693, § 77; 30 C.J. 230, § 467. * * *.

"Many authorities hold that before evidence of prior specific acts of violence may be adduced, the defendant is required to make a preliminary showing of his good faith as a reasonable person in believing it was necessary for him to kill his assailant to protect himself against great bodily harm. If it clearly appears that the defendant was the aggressor or that he was in no imminent danger of death or great bodily harm, evidence of prior acts of violence upon other persons by the deceased is not admissible. The trial court has a sound discretion to determine from all of the facts and circumstances adduced whether a prima facie showing of good faith on the part of the defendant has been established sufficiently to warrant the reception of evidence of prior acts of violence upon other persons by the deceased."

We are of the view that the trial judge, in the case now before us, was within the bounds of a sound discretion when he concluded that a sufficient showing of necessity to kill his antagonist, in order to protect himself was not made by the defendant.

■ As his third assignment of error, the defendant avers that the trial court erred in denying his motion for

a mistrial based on alleged gross misbehavior of the district attorney during the trial. The first incident referred to in the brief is the use of the word "murder," instead of a more appropriate word, in a question propounded to defendant on cross-examination. The court sustained defendant's objection, admonished the jury to disregard the use of the word and cautioned counsel, and the latter expressed his regret. There was no motion to declare a mistrial at this point or involving this incident. The defendant further, under his third specification, refers to his objections to questions propounded to defendant's witness Stewart, on cross-examination, as to whether he had received from one of the proprietors of the Las Vegas Club the gift of a colt and a pair of boots. Defendant's objections to the question were sustained. Further, under this assignment of error, the defendant lists nine instances of alleged misstatements on the part of the district attorney in his argument to the jury, which defendant contends amounted, in a cumulative way, to prejudicial misconduct. No objection was made to the alleged misstatements during the course of the argument, and no request was made for instructions to the jury on the subject. Under the rule announced in the case of State v. McNeil, 53 Nev. 428, 4 P.2d 889, the assignment of error on these matters cannot be considered at this time.

As his fourth assignment of error, the defendant avers that the trial court erred in permitting the deputy district attorney to make numerous defamatory statements and highly prejudicial remarks to the jury in his argument. On cross-examination, the defendant was asked if he was a vagrant on a certain day. Objection to the question was sustained and counsel admonished. Defendant further specifies that, in connection with the question last referred to, the deputy district attorney, without leave of court, exhibited to the jury an enlarged photograph of defendant with his fingerprints thereon. The record does not disclose this inci-

dent. The deputy district attorney, in his argument, used language implying that defense counsel "were getting $25,000 to defend Clifford Helm." The remark was objected to as prejudicial, and the court admonished the jury not to pay any heed to the same, as not in evidence. While the statement referred to was improper, we do not regard the incident as constituting reversible error, when considered in connection with the evidence as a whole. The defendant, in the brief, then lists several other excerpts from the argument of the deputy district attorney, and assigns prejudicial error thereon. No objection was made in any of the instances last referred to. Then follows the specification of a statement of the deputy district attorney which he concluded by saying to the jury, "I want to tell you that down there now in the Las Vegas Club they can get more witnesses than they brought here; probably all they have to do is ask for them." A motion for mistrial was then made. The trial judge denied the motion, saying "These are conclusions they have a right to draw." Defendant argues that the language used by the deputy district attorney insinuated "that the Las Vegas Club could and would bring witnesses and submit perjured testimony" upon defendant's request. As based on the circumstances surrounding the homicide as shown by the record, the statement objected to was a conjecture rather than a fair and reasonable inference. In the recent case of State v. Teeter, 65 Nev. 584, 200 P.2d 657, at page 682 et seq., HORSEY, J., discussed at length the inferences or conclusions which may or may not be fairly drawn by the district attorney in his argument to the jury. We reaffirm the principles and admonitions there set down. It should be noted, however, that the conclusions of Mr. Justice HORSEY that reversible error in that regard had occurred was not the majority ruling, the concurrence for a reversal of the judgment being confined to a different reason. While there is grave doubt, in the present case, as to the fairness of the language of the deputy

district attorney, we conclude that it did not constitute reversible error in view of the ample evidence supporting the conviction.

As his fifth assignment of error, the defendant avers that the trial court erred in overruling his objection to the state's chief medical witness testifying directly from typewritten notes. Dr. Cherry, the witness referred to, testified, in substance, that he conducted the autopsy, personally examined the body of the deceased, and, as the examination progressed, he dictated to Mr. Cupit and Dr. George the descriptions of the various wounds, his said assistants writing the descriptions in long-hand; that after the autopsy he checked the longhand notes referred to; that thereafter, using the notes referred to and a diagram of the body, made by himself at the autopsy, he prepared his typewritten findings as to the condition of the body as disclosed by the autopsy; and that he discarded or destroyed the original longhand notes; that the typewritten notes accurately reflected the information in the original notes; that, as near as the witness could recall, the typewritten notes were made on the day following the autopsy, or within a day or two thereafter. Defendant objected to the use of the typewritten notes on the ground that they were not the original notes, that the original notes were not made by the witness himself, were not typewritten contemporaneously with or immediately following the autopsy, and that the notes did not refresh the recollection of the witness, and were not permissible to be referred to. The objection was overruled. The typewritten notes themselves were not introduced in evidence. The witness testified, "I can testify to the entire autopsy procedure without my notes, but I cannot give you accurate measurements of the size of the lacerations or abrasions." It is clear that, as to the general description of the wounds, and excepting as to measurements and as to the smaller details, the witness testified from his recollection, refreshed, in some instances, by reference to the

typewritten statement. The witness testified, "this bullet that entered the left side of the chest entered the left side of the chest and traveled in a rightward direction to the right side of the chest—the right side of the back—was the bullet that was the cause of death, this bullet severing the ascending aorta, which is your large blood vessel attached to the top of the heart. It is the blood vessel that leads blood from the heart to the body— and was the one that caused his death, which, of course, was due to hemorrhage." He further testified, "It entered the pericardial sac, which is the sac that surrounds and covers the heart, so it was at the top of the heart, approximately, we will say, a half inch to three-quarters of an inch above the heart without actually touching the heart." It is evident that, in the testimony just quoted, the witness was testifying from present recollection. The record shows that the typewritten notes were used by the witness both as a record of past recollection, as to measurements and details, and as a means of refreshing his present recollection. In 3 Wigmore on Evidence, 3d ed., sec. 754, p. 97, under the heading of past recollection recorded, the author quotes from the case of Howard v. McDonough, 77 N.Y. 592, as follows: "After the witness has testified, the memorandum which he had used may be put in evidence,—not as proving anything of itself, but as a detailed statement of the items testified to by the witness. The manner in which the memorandum in such a case may be used is very much in the discretion of the trial judge."

We conclude that the trial court was within the bounds of sound discretion in allowing the use of the typewritten statement referred to, both to refresh present recollection and as a record of past recollection.

As his sixth assignment of error, defendant avers that the trial court erred in unduly restricting the defendant's cross-examination of the state's chief medical witness. The record shows that the court permitted a lengthy cross-examination of the witness referred to, and that

such limitations as were placed thereon were within the discretion of the court. State v. McNeil, 53 Nev. 428, 4 P.2d 889.

The seventh assignment is that the trial court erred in admitting in evidence articles of clothing worn by the deceased at the time of the homicide. There were a number of such articles. Defendant objected that, because of their bloodstained condition, they would tend to arouse, and were offered for the purpose of arousing, in the jurors a prejudice against the defendant. Defendant, at that juncture of the trial, undertook to concede the location of the wounds on the body of the deceased, although counsel vigorously sought to discredit the principal medical witness of the state. Lack of necessity, therefore, cannot be invoked as against the exhibiting to the jury of the coat, shirt and undershirt. They tended to corroborate the testimony of the witness referred to, and other witnesses, as to the location and direction of the wounds, and, by inference, the positions and attitudes of defendant and deceased when the shots were fired. As to the necktie, there was an issue as to which knife was used in its cutting. The trousers were stained with dirt and grease on the knees, caused, so the state argued, from the kneeling of the deceased on the boiler-room floor. The admission of the other garments, shorts and shoes, was not objectionable on the ground urged. The trial judge may, in his sound discretion, reject the offer in evidence of objects calculated to arouse the passions of the jurors. 4 Wigmore on Evidence, 3d ed., sec. 1157; State v. Gallegos, 45 N.M. 404, 115 P.2d 626. We find no error in this regard.

The eighth assignment of error is directed against the rulings of the trial court in admitting in evidence certain photographs, numbered as state's exhibits 19, 20, 21 and 22. The objection was made that they were posed photographs, had no connection with the occurrence, and that they were offered to arouse the prejudice of the jury against the defendant. The photograph No. 19, showing the deceased in his bloodstained clothing,

was taken at 5:30 p. m. on the day of the homicide, according to the testimony of the witness Horner, who took the photographs. No. 20, a photograph of the head of the deceased, shows a scalp wound and wounds on the face. No. 21 shows wounds on the left hand and arm. No. 22 shows the bullet wounds on the back of the neck and at the right shoulder blade. Testimony describing these wounds was given by Dr. Cherry. The last three photographs were taken at the mortuary at about 9:30 p. m. of the same day, according to the testimony of Horner. The latter testified that the photographs were good representations of what he saw. This subject was dealt with by this court in the case of State v. Roberts, 28 Nev. 350, 82 P. 100, and in State v. Holt, 47 Nev. 233, 219 P. 557. The Roberts case, like the one now before us, involved photographs of wounds. This court said that they were [28 Nev. 350, 82 P. 103] "illustrative and instructive in connection with the testimony of the doctor and other witnesses." In the Holt case, after quoting from the opinion in the Roberts case, this court said [47 Nev. 233, 219 P. 560] : "In this age of general education, wherein people are trained to think, we believe there is little danger of the minds of a jury being influenced merely because a bloody garment, a photograph showing a bloody garment, or any other bloody object is introduced in evidence and exhibited to them. But, however this may be, if such evidence can serve to throw light upon the matter inquired into, or can present a situation for the enlightment of the jury more clearly and satisfactorily than can be presented by oral testimony, we think it is no abuse of discretion for the court to permit its introduction."

\*　　\*　　\*　　\*　　\*　　\*　　\*

See, also, the recent case of Godvig v. Lopez, Or., 202 P.2d 935, 937. The photograph No. 19 showing the body of the deceased in his clothing, served to connect the clothing, as introduced in evidence, as the garments worn by him at the time of the homicide. As stated in Godvig v. Lopez, supra, "there is no best evidence rule

which excludes photographic evidence merely because some witness has testified concerning the conditions portrayed in the picture." Nor would the fact that the garments themselves had been received in evidence indicate an abuse of discretion in admitting the photograph. Upon the principles adopted in the cases last referred to, we find no abuse of discretion or other error in the rulings admitting in evidence the photographs referred to.

The ninth assignment is directed against the court's instruction No. 21. The use of the language quoted in the instruction, from section 10081, N.C.L. 1929, was proper. The subject of burden of proof with regard to self-defense is adequately covered in other instructions.

The tenth assignment is directed against instruction No. 31. Defendant objects to the use of the word "evidence" appearing as follows: "No threats or menaces made by Ferroni against the defendant, Clifford Duane Helm, can justify the killing of Ferroni unless at the time of the killing, Helm was actually assailed or had sufficient evidence to convince a reasonable man that he was in immediate danger," etc.

Defendant urges that the accused may act, in self-defense, on "appearances," rather than on evidence. Webster defines the word "evidence" as meaning, in its legal application, "that which is legally submitted to a competent tribunal as a means of ascertaining the truth * * *. Properly evidence is to be distinguished from proof, which is the effect of evidence * * *." The defendant was required to, and did, submit in evidence the alleged facts and circumstances on which he relied to support his plea of self-defense. The instruction stated that if such evidence did not justify his conduct as a reasonable man, the homicide could not be justified by the mere possibility that Ferroni might return and seek revenge. In other instructions, the jury were instructed that a person assailed may act on such appearances as would influence a reasonable man. If defendant desired a further clarification of the subject, he should

have submitted a requested instruction for that purpose. State v. Davis, 14 Nev. 407; State v. McLane, 15 Nev. 345; State v. St. Clair, 16 Nev. 207; State v. Hing, 16 Nev. 307; see, also, 8 Cal.Jur. 309, sec. 362. We find no error in the giving of the instruction referred to.

The eleventh assignment is directed against instruction No. 33. The defendant charges that portions of the instructions are misstatements of the law. The instruction opens with a reference to "apparent danger," and closes with a reference to "reasonably apparent danger." We consider that the element of apparent danger is sufficiently embodied in the instruction, and find no error therein.

The twelfth assignment is directed against instruction No. 35. The instruction deals with the duty of one assailed to withdraw from the conflict by all reasonable means consistent with his own safety, so as to avoid the killing of his assailant. Defendant objects to the use of the words "a reasonable effort" in that connection. An instruction in the same language was before this court in the case of State v. Robison, 54 Nev. 56, 6 P.2d 433, and no error was found in the instruction. While the use of the words "a reasonable effort" was not under special consideration at that time, we consider the words unobjectionable in describing the duty of the person assailed, and consistent with the idea of reasonable safety on his part. We find no error in the instruction.

The thirteenth assignment is directed against instruction No. 36. The element as to reasonable apprehension of danger is properly presented, and we regard the instruction as being in conformity with the law on the subject.

The fourteenth assignment is directed against the rulings of the court in refusing to give certain of the defendant's requested instructions. We have examined the fourteen requested instructions which appear in the record. One of them touched upon the adverse presumption alleged to arise from the willful suppression of evidence on the part of the state. Our attention is not

directed to the matter referred to, nor have we discovered any willful suppression of evidence in the record. We find no error in that regard. One of the requested instructions relates to the degree of proof necessary to warrant a conviction on circumstantial evidence. The trial court refused the offer, endorsing thereon his reason that there was not enough evidence in the case to warrant such instruction. Instruction No. 56, given by the court, is a sufficient instruction in that regard, in view of the evidence in the case. On most of the requested instructions the trial judge endorsed his reason for refusal, with which reasons we agree. Without further dealing with the requested instructions separately, we find, in each instance, no prejudicial error in the refusal to give the same.

Assignment No. 15 is directed against the action of the trial court in excusing certain prospective jurors "out of court." District Court Rule No. 28 provides as follows: "No juror shall be excused except in open court; and when a juror is excused, the clerk shall immediately withdraw his name from the box for the period for which he has been excused."

In the opening proceedings on the day of trial, the clerk of the court, under the court's direction, called the roll of the veniremen, and, as to each individual theretofore excused by the court, the clerk stated, "Excused by the court." The trial judge stated that those who were so excused were excused on the ground of illness and doctors' certificates, illness in the family, mothers of children. We regard this proceeding as substantially complying with the rule referred to.

Assignment No. 16 is directed against the action of the court in overruling defendant's objection to the admission in evidence of a certain conversation, without preliminary proof of the names of the persons present. The conversation included an alleged admission of the defendant relating to the charge against him. The witness testified that, in addition to himself, the defendant and two other persons whom he named, there were pres-

ent others who had come to the scene of the homicide and whose names were unknown to the witness. We find no error in the ruling referred to.

Assignment No. 17 is directed against the overruling of defendant's objections to certain questions propounded by the state to a witness who was present when the defendant made a detailed statement relative to the homicide. The questions related to the conditions under which the statement was made—whether voluntary or under improper influences. The witness was asked if inducements were held out to the defendant, if any threats were made, any promise of reward, or any force used, all of which was answered in the negative. Leading questions are permissible which direct the attention of the witness to the subject matter. We regard the rulings referred to as within the sound discretion of the trial judge.

Assignment No. 18 is directed against the sustaining by the court of objections made by the state to certain questions propounded to defendant by his counsel for the purpose of showing a motive for the alleged assault by the deceased on the defendant, and to support the defendant's plea of self-defense. Defendant testified that an altercation had occurred between himself and the deceased about the middle of March, that no threats against himself had been made by the deceased, but that the latter "cussed" him. The state objected to the relating of further details of the conversation, on the ground that they were too remote from the homicide. The trial judge stated that he would entertain an offer of such evidence, the offer to be made in the absence of the jury, and the defense expressed its intention to make such an offer. We are not directed to any such subsequent offer in the record. In ruling on the subject the trial court said: "I will let you put it in in the absence of the jury, but it has no materiality as to the form of the question or what you intend to prove as to the alleged occurrence in the Information or in any of the testimony so far adduced at this trial, no materiality."

The defense moved for a mistrial, arguing that the court had, in effect, told the jury that none of the testimony theretofore offered on behalf of the defendant had any materiality or bearing on the case. To which the court said: "That is not the truth," and overruled the motion for a mistrial. We do not believe the jury were misled or the defendant prejudiced by reason of this incident.

█ Assignment No. 19 is directed against the ruling of the court denying the defendant's motion for a new trial. Among other reasons, the defendant avers that a new trial should have been granted for the reason that a portion of the trial was held in the absence of the defendant, in that the instructions were settled in chambers without the presence of the defendant. In support of this contention, defendant cites the case of Kline v. Vansickle, 47 Nev. 139, 217 P. 585, 586. It was there held that "ruling upon tendered instructions and objections thereto is a part of the trial of a case, and the trial must be in open court and all objections and exceptions must be made there." In the case referred to, being a civil suit, the statutory provisions there considered, in relation to instructions to the jury and exceptions thereto, are not applicable here. N.C.L., section 11028, being section 380 of the Criminal Practice Act, reads as follows: "When any written charge has been requested and given, or refused, or given by the court of its own motion, the question or questions contained in such charge need not be excepted to; but the written charge, given or refused, with the endorsement showing the action of the court, shall form part of the record, and any error in the decision of the court thereon may be taken advantage of on appeal in like manner as if presented in a bill of exceptions."

The record contains the original instructions given by the court, as well as all of the requested instructions, which are dealt with above. The requested instructions bear the endorsement of the trial judge, showing that they were refused, excepting the last one. All are certi-

fied to by the clerk of the court as instructions not given. Upon the opening of the proceedings on October 1, 1948, the trial judge said: "All present. Mr. Jones, here are the instructions. The clerk will file the instructions. I changed the date all through to October 1st. Ladies and gentlemen of the jury and the alternate juror, the State and the defense having completed the introduction of evidence, the court will now read its instructions to you."

The judge then read his instructions to the jury. During these proceedings, no objection or comment was made on the part of the defendant, nor was there any further request for instructions. Under the statutory provision above quoted, we consider the foregoing as showing, by the record, that the instructions were settled in open court, the defendant being present.

Under the nineteenth assignment, defendant further avers that a new trial should have been ordered because the court misdirected the jury as to matters of law and erred in decisions of law arising during the course of the trial. These matters have been dealt with above.

Finding no prejudicial error in the record, the judgment and the order denying a new trial in this cause are affirmed.

BADT and EATHER, JJ., concur.

HORSEY, C. J., being absent on account of illness, the Governor designated HON. WM. D. HATTON, Judge of the Fifth Judicial District, to sit in his place.

ON PETITION FOR REHEARING

November 3, 1949.

*Per Curiam:*

Rehearing denied.