OLIVER A. CARTER, APPELLANT, v. THE STATE OF NEVADA, RESPONDENT.

No. 16287

April 24, 1986                                      717 P.2d 1111

*Kevin M. Kelly,* Las Vegas, for Appellant.

*Brian McKay,* Attorney General, Carson City; *Robert Miller,* District Attorney, *James Tufteland,* Deputy District Attorney, *John E. Ham,* Deputy District Attorney, Clark County, for Respondent.

## OPINION

*Per Curiam:*

An information named appellant Carter and his co-defendant, Robert Holding, as joint defendants and charged them with committing felony embezzlement on January 15, 1983, in violation of NRS 205.300. Both defendants elected to be represented by the same attorney, Kevin Kelly, who had represented Holding in a prior unrelated matter. Attorney Kelly discussed with the two defendants the possibility of a conflict of interest arising out of his dual representation. Both defendants told the attorney that they were content to be represented by him. Subsequently, the two defendants formally acknowledged their acceptance of dual representation in two different formal appearances before Justice of the Peace Earle White and District Judge Joseph Pavlikowski, each of whom canvassed them on the possibilities of conflict inherent in their joint representation.

Thereafter, the state filed an additional charge of embezzlement against Holding for activities occurring between January 10 and January 14, 1983. Kelly also represented Holding on this separate charge.

The original case against Carter and Holding was set for trial on November 2, 1983. Before the jury was selected, defense counsel made an oral motion *in limine* to preclude the state from introducing any testimony concerning Holding's activities relative to the second case, wherein Holding alone was charged. The

trial judge denied this motion, ruling that the state could legitimately introduce such evidence. The judge suggested at the same time that, in the interest of judicial economy, the two cases might be consolidated because both involved essentially the same parties, witnesses, and circumstances. Defense counsel Kelly then moved to consolidate the two cases, and the state agreed to the consolidation. The court granted the motion and the two cases were consolidated.

At the time of the mentioned hearing the trial judge indicated a concern about the potential conflict in legal representation resulting from the dual representation during the trial of the consolidated cases. Defense counsel then urged the trial judge to canvass the co-defendants again about the possible prejudice which could result from the joint representation. The court thereupon informed the co-defendants of the potential for conflict and obtained their waiver of any prejudice that might result from the joint representation.

The consolidated cases did not come to trial until March 5, 1984. Outside the presence of the jury, the trial judge again canvassed the co-defendants on their waiver of the possible conflict. The judge reminded counsel that in this kind of arrangement conflict could manifest itself in a variety of ways. Attorney Kelly assured the court, "There is no conflict."

The state then presented its case-in-chief along the following lines: Holding was the store manager of a supermarket. It was customary on weekends for him to make a bank drop of the store's cash receipts. According to the state's theory, Holding and Carter embezzled this money by staging a robbery of company funds in front of the bank, with Carter playing the part of the bandit. The "robbery" was staged in order to cover up an embezzlement by Holding of the store's money earlier in the week. Holding's previous, direct embezzlement was the subject of the separate charge against him.

Holding reported to the police that the perpetrator of the robbery had fled in Holding's personal vehicle. This report was contradicted by a witness for the state who had observed Carter park Holding's car one block away from the scene of the supposed robbery and then leave the area in another car. This eyewitness also obtained the license plate numbers of both vehicles, thinking that they were stolen. The plates were traced back to Holding and Carter, who lived at the same residence.

One of the last of the state's witnesses to be called was Patrolman Rocky Alby, who took the initial robbery report from Holding. The report was marked as Exhibit "9." It indicated the manner and the direction in which the suspect fled as well as a description, which stated that the suspect was a male of unknown

race, 5'10", 180 pounds, approximately 25 or 30 years old, wearing dark clothes and a black ski mask.

When the state sought admission of the report, defense counsel Kelly objected on the grounds of lack of *relevancy*. The relevancy objection was overruled, the exhibit was received, and Alby concluded his testimony. Thereafter the jury was admonished, sent home for the evening, and advised to return the following day.

After the jury retired, the trial judge addressed defense counsel asking him if he persisted in his "hearsay" objection to Exhibit "9."[1] The court's obvious and expressed concern was that the exhibit was a proper subject of hearsay objection for client Carter, but not so for client Holding. The judge then observed that this "raises a complete conflict" and that he could "think of no joinder more prejudicial to Mr. Holding than the joinder with Mr. Carter in view of this latest testimony that has come in."

The trial judge decided to declare a mistrial, saying:

> Number one is that the joinder of these two cases is in the Court's view disastrous. That is to say that the case against Mr. Holding individually, that same case being C64070, may and must be defended in a manner quite different than that where both defendants are charged in C61953, but that should Mr. Holding and Mr. Carter, particularly Mr. Carter, be found guilty in the cases which they are both charged, the jury would, it is apparent to the Court, automatically hold Mr. Holding guilty of the case in which he is charged by himself.
>
> Two is although counsel for the defense has been can-vassed on more than one occasion regarding possible conflict in the case and has assured the Court and his clients and opposing counsel no such conflict does exist, an apparent conflict has already arisen, namely the introduction of Exhibit No. 9 by the State over the hearsay objection by counsel for the defense.
>
> Counsel for the State asserts that the hearsay to Mr. Carter of Mr. Holding's prior statement to the police might be construed by a higher court to be admissible against Mr. Carter as well as an exception to the hearsay rule in the line that this document would be a statement by one co-conspirator in furtherance of the conspiracy, and although

---

[1]Defense counsel, as stated, objected on grounds of relevancy not hearsay. Nevertheless, when asked by the court if he "persisted" in his "hearsay objection" to Exhibit "9," counsel replied, "I do." As a consequence we must assume an objection was interposed on hearsay grounds. Defense counsel's failure to object on hearsay grounds in the first instance may be taken as further indication of the impediment resulting from dual representa-tion.

neither one is charged with conspiracy, the Goldsmith case cited by the State is the case upon which the State relies to make that document admissible. The Court, of course, disagrees with this conclusion, in regarding Exhibit 9, the prior exculpatory statement of Mr. Holding would be hearsay as to Mr. Carter which brings me to my third and final point. Aside from the disastrous joinder of these two cases and the conflict which has already appeared, there is little doubt in the Court's mind that an appellate court would reverse this for the conflict that will occur in representing both of these defendants, and likewise in view of what I construe to be an improper joinder of the two cases.

Carter was retried after the involuntary mistrial, and on the second trial he was convicted of embezzlement. On appeal Carter raises a number of issues, but the critical issue is whether he was subjected to double jeopardy by reason of the second prosecution after the first trial was declared a mistrial.

A defendant may not be prosecuted more than once for the same offense and be subjected to double jeopardy. U.S. Const., amend. V; Nev. Const., art. I, § 8.

In a jury trial, "jeopardy attaches when the jury is empaneled and sworn," Crist v. Bretz, 437 U.S. 28, 29 (1978); State v. Helm, 66 Nev. 286, 291, 209 P.2d 187, 190 (1949). The defendant, at that point, has a " 'valued right to have his trial completed by a particular tribunal,' " United States v. Jorn, 400 U.S. 470, 484 (1970), *quoting* Wade v. Hunter, 336 U.S. 684, 689 (1949).

As a general rule the prosecutor is entitled to only one opportunity to require an accused to stand trial. Where a criminal trial ends in acquittal or conviction, retrial is, of course, automatically barred (unless, of course, the conviction is later reversed); however, in the case now before us, the criminal trial was terminated without a final resolution of the charge and without the consent of the accused.

A number of possible circumstances may arise during a trial which may make it necessary to discharge a jury before the trial is concluded by either acquittal or conviction. In such instances, when the jury is necessarily discharged, the constitutional question arises as to whether a second trial can ensue without violating the accused's right to freedom from exposure to double jeopardy.

An example of a proper second trial can be found in our case of State v. Helm, 66 Nev. 286, 209 P.2d 187 (1949). In that case, after the trial had begun, it was discovered that the defendant had not been allowed his sixth peremptory challenge. Counsel for the defendant refused to waive the deficiency in jury selection; whereupon, the trial judge declared a mistrial saying:

> Whenever a trial has commenced whether for misdemeanor or felony [and] the judge discovers any imperfection which will render a verdict against the defendant either void or voidable by him, he may stop the trial, and what has been done will be no impediment in the way of any future proceedings.

*Helm,* above, 66 Nev. at 291, 209 P.2d at 190; *see also* Illinois v. Somerville, 410 U.S. 458 (1973). (A defective indictment that was reversible error and could not be cured under state law after the jury was sworn was sufficient grounds for declaring a mistrial.) There was a manifest necessity to declare a mistrial in the *Helm* case.

The Supreme Court of the United States has recognized that because of the importance of the right of an accused not to be faced with more than one trial, the state has the burden of justifying the granting of a mistrial if it is to bring the accused to trial again and avoid the double jeopardy bar. Arizona v. Washington, 434 U.S. 497 (1977). "The prosecutor must demonstrate 'manifest necessity' for any mistrial declared over the objection of the defendant." *Id.* at 505.

The phrase "manifest necessity" is taken from United States v. Perez, 9 Wheat. 579, 580 (1824) (Mr. Justice Story), in the following context:

> We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a *manifest necessity* for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes. . . . But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of the discretion, rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office.

(Emphasis added.)

The Supreme Court in *Arizona* has interpreted manifest necessity to mean a "high degree" of necessity, 434 U.S. at 506. Whether a high degree of necessity has been reached is answered more easily in some cases than in others. In *Helm* it was easy; the facts made it abundantly clear that it was absolutely necessary to declare a mistrial. In the case before us, it is not so clear. The

question now presented is what other circumstances will meet the manifest necessity standard so as to justify the declaration of a mistrial without resulting in double jeopardy to the defendant upon retrial.

We recognize that a defendant may waive the right to conflict-free representation. Kabase v. District Court, 96 Nev. 471, 611 P.2d 194 (1980). This right of waiver, however, cannot preclude a trial court from declaring a mistrial when there is a manifest necessity for doing so. Although defendants were repeatedly canvassed concerning ostensible conflict, their statements are rather clearly tied to the advice of their mutual counsel and to the trust they have placed in that counsel. Such statements must be received with caution and in the context of other factors inherent in the dual representation, factors which are more palpable by the trial judge than to anyone else.

It was not extreme nor beyond the court's discretion for the trial judge to view the consolidated trial as being "disastrous." The trigger for the court's final decision to declare a mistrial was the difference of the two defendants' standing to make hearsay objections, a point raised by the court on its own. Viewing the trial as a whole we cannot and should not say that a manifest necessity to declare a mistrial was lacking in this case.

The appellant's constitutional right not to be twice placed in jeopardy has not been violated. Other assignments of error are without merit. We therefore affirm the conviction.