[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 184 
Benjamin Franklin Cox, the appellant, was convicted for the murder of Michael Donald, in violation of Ala. Code 1975, §13A-6-2, and was sentenced to 99 years' imprisonment. Cox presents three issues on this appeal from that conviction.
 I.
Cox argues that his indictment and conviction for murder was barred under principles of former jeopardy because an indictment charging the conspiracy to commit that same murder had previously been dismissed because it was barred by the statute of limitations. We hold that Cox's indictment and conviction for murder was not barred by the dismissal of the conspiracy indictment.
There is no contention that this issue has not been preserved for appellate review by proper and timely objection at trial. See Lambeth v. State, 380 So.2d 925, 926 (Ala.Cr.App. 1979), cert. denied, 380 So.2d 926 (Ala. 1980) (a motion to exclude the evidence can properly raise the issue); Calvert v. State,26 Ala. App. 189, 190, 155 So. 389 (1934) ("In a criminal case, a defendant is not required to file a special plea of the *Page 185 
statute of limitations. . . . If the evidence fails to disclose that the offense was committed within the statute, the State fails to make out its case."). See also Stoner v. State,418 So.2d 171, 177-78 (Ala.Cr.App.), cert. denied, 418 So.2d 184
(Ala. 1982), cert. denied, 459 U.S. 1128, 103 S.Ct. 764,74 L.Ed.2d 978 (1983).
In March 1981, Michael Donald's body was discovered hanging from a tree on Herndon Avenue in Mobile, Alabama. He had been hanged by Ku Klux Klansmen in retaliation for the mistrial in the case of Josephus Anderson, a black man eventually convicted and sentenced to life without parole for the capital murder of a white Birmingham police officer. See Ex parte Anderson,457 So.2d 435 (Ala.Cr.App.), affirmed, 457 So.2d 446 (Ala. 1984) (pretrial mandamus); Anderson v. State, 542 So.2d 292
(Ala.Cr.App. 1987), writ quashed, 542 So.2d 307 (Ala. 1989), cert. denied, 493 U.S. 836, 110 S.Ct. 116, 107 L.Ed.2d 77
(1989) (conviction).
From the record before this court, the Klansmen allegedly involved in this offense were Henry Francis Hays, Bennie J. Hays (Henry Hays' father), James "Tiger" Knowles, and the appellant Cox (Bennie Hays' son-in-law and Henry Hays' brother-in-law). In 1983, Henry Hays was convicted for capital murder and sentenced to death for his part in this offense. SeeHays v. State, 518 So.2d 749 (Ala.Cr.App. 1985), affirmed in part, reversed in part, 518 So.2d 768 (Ala. 1986), cert. denied, 485 U.S. 929, 108 S.Ct. 1099, 99 L.Ed.2d 262 (1988). In 1985, James Knowles pleaded guilty in United States District Court to depriving Michael Donald of his civil rights and was sentenced to life imprisonment. See Marshall v. Bramer,110 F.R.D. 232, 237 (W.D.Ky. 1985), affirmed, 828 F.2d 355 (6th Cir. 1987). In return, the federal prosecutor recommended that Knowles not be prosecuted for capital murder in state court and Knowles agreed to become a State's witness against his fellow Klansmen.
In December 1984, Cox was indicted for the crime of conspiracy to commit murder. That indictment charged that Cox
 "did, with the intent to cause the death of Michael Donald, agree with Henry Hayes [sic] and James Knowles to cause the death of Michael Donald, a violation of § 13A-6-2 of the Code of Alabama, and subsequent to the making of said agreement and in furtherance of said agreement, BENJAMIN F. COX, JR., did provide a length of rope to Henry Hayes and/or James Knowles to be used to strangle Michael Donald, and Henry Hayes and James Knowles did cause the death of Michael Donald by strangling him with said rope, in violation of § 13A-4-3 of the Code of Alabama."
A jury was impaneled and the trial began on March 11, 1985. On March 14, 1985, after the State had presented its case-in-chief, the trial court granted Cox's motion to dismiss because, under the law in effect at that time, the prosecution for criminal conspiracy was barred by a three-year statute of limitations. See Ala. Code 1975, § 15-3-1. The indictment was dismissed and Cox was discharged.
In August 1987, Cox was reindicted for the murder of Michael Donald. The new indictment charged that "Cox . . . did, with the intent to cause the death of Michael Donald, cause the death of Michael Donald by strangling him with a rope, in violation of § 13A-6-2 of the Code of Alabama." Cox's trial, which was consolidated with that of Bennie J. Hays, began on February 1, 1988. On February 5, 1988, a mistrial was declared when codefendant Hays became ill and collapsed during the course of the trial.
Cox's second trial on the August 1987 murder indictment began on May 15, 1989. He was convicted on May 18, 1989. This appeal is from that conviction.
Cox argues that under principles of former jeopardy, his 1989 trial for murder was barred because of the 1985 dismissal of the conspiracy indictment. The State argues 1) that conspiracy and murder are distinct and separate offenses so that the prosecution for one does not bar the prosecution for the other, and 2) that the indictment and prosecution for conspiracy were void because the trial court was without jurisdiction. *Page 186 
 A.
The State relies on Blockburger v. United States,284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), for its argument that the dismissal of the conspiracy prosecution did not bar the prosecution for murder because each offense required proof of an additional element. Appellee's brief at 23 (filed September 11, 1990). Under Blockburger, "[t]he applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not." 234 U.S. at 304, 52 S.Ct. at 182.
However, Blockburger is no longer the proper standard to apply to a situation involving a subsequent prosecution such as that involved here. On May 29, 1990, the United States Supreme Court decided the case of Grady v. Corbin, 495 U.S. ___, ___,110 S.Ct. 2084, 2087, 109 L.Ed.2d 548 (1990), and held that "the Double Jeopardy Clause bars a subsequent prosecution if, to establish an essential element of an offense charged in that prosecution, the government will prove conduct that constitutes an offense for which the defendant has already been prosecuted."
 "To determine whether a subsequent prosecution is barred by the Double Jeopardy Clause, a court must first apply the traditional Blockburger test. If application of that test reveals that the offenses have identical statutory elements or that one is a lesser included offense of the other, then the inquiry must cease, and the subsequent prosecution is barred. Brown [v. Ohio, 432 U.S. 161, 166, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977)].
". . . .
 "[However], a subsequent prosecution must do more than merely survive the Blockburger test. As we suggested in [Illinois v.] Vitale [447 U.S. 410, 100 S.Ct. 2260, 65 L.Ed.2d 228 (1980)], the Double Jeopardy Clause bars any subsequent prosecution in which the government, to establish an essential element of an offense charged in that prosecution, will prove conduct that constitutes an offense for which the defendant has already been prosecuted.
This is not an 'actual evidence' or 'same evidence' test. The critical inquiry is what conduct the State will prove, not the evidence the State will use to prove that conduct."
Corbin, 495 U.S. at ___, 110 S.Ct. at 2090, 2093 (emphasis added) (footnotes omitted).
Prior to Corbin, the general rule was that conspiracy to commit a crime and the commission of the crime were two criminal acts which were not identical in law or fact so that the prosecution for one did not bar a prosecution for the other. See Connelly v. State, 30 Ala. App. 91, 92, 1 So.2d 606,607, cert. denied, 241 Ala. 132, 1 So.2d 608 (1941) (acquittal of crime of carrying on business of bookmaking or pool selling did not bar prosecution for conspiracy to commit that offense).
 "It has been long and consistently recognized by the Court that the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses. The power of Congress to separate the two and to affix to each a different penalty is well established. . . . A conviction for the conspiracy may be had though the substantive offense was completed. . . . And the plea of double jeopardy is no defense to a conviction for both offenses. . . . It is only an identity of offenses which is fatal. . . . A conspiracy is a partnership in crime. . . . It has ingredients, as well as implications, distinct from the completion of the unlawful project. As stated in United States v. Rabinowich, 238 U.S. 78, 88, 35 S.Ct. 682, 684, 685, 59 L.Ed. 1211 [1915]:
 " 'For two or more to confederate and combine together to commit or cause to be committed a breach of the criminal laws is an offense of the gravest character, sometimes quite outweighing, in injury to the public, the mere commission of the contemplated crime. It involves deliberate plotting to subvert the laws, educating and preparing the conspirators for further and habitual criminal practices. And it is characterized by secrecy, rendering it difficult of detection, requiring more *Page 187 
time for its discovery, and adding to the importance of punishing it when discovered.' "
Pinkerton v. United States, 328 U.S. 640, 643-44,66 S.Ct. 1180, 1182, 90 L.Ed. 1489 (1946). The rationale for the "long line of decisions [considering conspiracy and the completed substantive offense to be separate crimes] rests on the very nature of the crime of conspiracy" which "poses distinct dangers quite apart from those of the substantive offense."Iannelli v. United States, 420 U.S. 770, 778, 95 S.Ct. 1284,1290, 43 L.Ed.2d 616 (1975).
 "It is settled law in this country that the commission of a substantive offense and a conspiracy to commit it are separate and distinct crimes, and a plea of double jeopardy is no defense to a conviction for both. See Pinkerton v. United States, 328 U.S. 640, 643-644, 66 S.Ct. 1180, 1181-1182, 90 L.Ed. 1489, and cases cited therein. Only if the substantive offense and the conspiracy are identical does a conviction for both constitute double jeopardy. Cf. Gavieres v. United States, 220 U.S. 338, 31 S.Ct. 421, 55 L.Ed. 489 [1911]."
Pereira v. United States, 347 U.S. 1, 11, 74 S.Ct. 358, 364,98 L.Ed. 435 (1954) (convictions on substantive counts of violation of mail fraud statute and violation of National Stolen Property Act and conviction of conspiracy to commit such crimes did not constitute double jeopardy).
 "Where the commission of a substantive offense and a conspiracy to commit it are separate and distinct crimes, as is generally the case, a plea of double jeopardy is no defense to a conviction for both offenses; only if the substantive offense and the conspiracy are identical does a conviction for both constitute double jeopardy.
 "Accordingly, neither an acquittal nor a conviction of a conspiracy to commit a crime is a bar to a prosecution for the commission of that crime, or for aiding and abetting another to commit it, although as to the latter there is authority to the contrary."
22 C.J.S. Criminal Law § 264 at 309 (1989) (footnotes omitted).
There is authority that this principle — that a conspiracy and the substantive offense are separate offenses — survivesCorbin. See United States v. Esposito, 912 F.2d 60, 65 (3d Cir. 1990), cert. dismissed, ___ U.S. ___, 111 S.Ct. 806,112 L.Ed.2d 1032 (1991) (assuming that the substantive offense-conspiracy distinction survives Corbin); United Statesv. Scarpa, 913 F.2d 993, 1013-14 n. 8 (2d Cir.), cert. denied, ___ U.S. ___, 111 S.Ct. 57, 112 L.Ed.2d 32 (1990) (same);United States v. Pungitore, 910 F.2d 1084, 1110-11 (3d Cir. 1990) (same); Apostoledes v. State, 83 Md. App. 519,575 A.2d 792, 795, cert. granted, 321 Md. 225, 582 A.2d 531 (1990) (same). However, under the particular facts of this case, the conspiracy and the accomplice murder liability are identical. While this Court does not have a transcript of the evidence presented at the conspiracy trial, it appears undisputed that the State relied upon the same evidence in both the conspiracy and the murder trials. Indeed, whether Cox was tried for conspiracy or murder, his conduct remains the same — he participated in the planning of the murder and supplied the rope used to hang the victim. Although there is a distinction between liability as a conspirator and liability as an accomplice, Chisler v. State, 553 So.2d 654, 664-65
(Ala.Cr.App. 1989), cert. denied, ___ U.S. ___, 110 S.Ct. 2572,109 L.Ed.2d 753 (1990), in this case, Cox's conduct subjected him to criminal liability both as a conspirator and as an accomplice. See Chisler, 553 So.2d at 665 ("The failure to distinguish the principles of conspiracy and complicity liability no doubt exists because the two 'normally go hand-in-hand,' . . . and in most of the cases the accomplice who aided and abetted the offense was also a conspirator who agreed beforehand with the perpetrator to commit the offense.").
Here, the State relied upon the same conduct in each prosecution. Indeed, under the facts of this case, proof of the conspiracy was essential to Cox's conviction as an accomplice for murder. Therefore, it is arguable that if thePinkerton-Pereira-Iannelli line of cases is not an exception to *Page 188 Corbin, and if Corbin is read literally and applied comprehensively, then Corbin bars Cox's trial for murder because the murder prosecution required proof of the same conduct which constituted the conspiracy.
However, we do not believe Corbin is controlling here for several reasons. First, as the Second Circuit Court of Appeals observed in another context, "Grady [v. Corbin] does not even discuss the '[conspiracy] exception' to double jeopardy, and we do not read the opinion as overruling it sub silentio." UnitedStates v. Quinones, 906 F.2d 924, 928 (2d Cir. 1990), cert. denied, ___ U.S. ___, 111 S.Ct. 789, 112 L.Ed.2d 851 (1991) (declining to find that Corbin overruled the "sword exception" to double jeopardy).
Second, we believe that a literal reading of the phrase "has already been prosecuted" in the Corbin holding is at odds with other settled areas of double jeopardy jurisprudence. The phrase "has already been prosecuted" must be interpreted narrowly within the context of its facts to mean "has already been convicted or acquitted." Cox was neither convicted nor acquitted of conspiracy.
Corbin's broadly-worded holding that a subsequent prosecution is prohibited if it necessitates proof of conduct constituting an offense for which the defendant "has already beenprosecuted," 495 U.S. at ___, 110 S.Ct. at 2087,109 L.Ed.2d at 557 (emphasis added), taken literally, means that the conduct at issue in one prosecution — regardless of the circumstances or outcome of that prosecution — cannot be put at issue in a subsequent prosecution. If we were to read the "has already been prosecuted" language literally, and if we assume that inCorbin the Supreme Court meant to prohibit the relitigation of conduct underpinning any earlier prosecution, then we would have to conclude that the Supreme Court tacitly overruled the entire body of double jeopardy jurisprudence which:
(1) allows retrial after reversal on the basis of error, upon a defendant's appeal, United States v. Tateo, 377 U.S. 463,84 S.Ct. 1587, 12 L.Ed.2d 448 (1964); Ball v. United States,163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300 (1896);
(2) allows retrial after a mistrial has been declared at the defendant's request, United States v. Dinitz, 424 U.S. 600,96 S.Ct. 1075, 47 L.Ed.2d 267 (1976), or because of "manifest necessity," Arizona v. Washington, 434 U.S. 497, 98 S.Ct. 824,54 L.Ed.2d 717 (1978) (improper opening statement by defense counsel); Illinois v. Somerville, 410 U.S. 458, 93 S.Ct. 1066,35 L.Ed.2d 425 (1973) (indictment failed to charge an offense);Thompson v. United States, 155 U.S. 271, 15 S.Ct. 73,39 L.Ed. 146 (1894) (juror disqualified from serving); United States v.Perez, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824) (hung jury);
(3) allows a second prosecution by a separate sovereign,Abbate v. United States, 359 U.S. 187, 79 S.Ct. 666,3 L.Ed.2d 729 (1959) (federal prosecution after conviction for same conduct in state prosecution); Bartkus v. Illinois,359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959) (state prosecution after acquittal for same conduct in federal prosecution); Heathv. Alabama, 474 U.S. 82, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985) (prosecution by one state after conviction for same conduct in another state); or
(4) allows a second prosecution because the defendant's own actions deprived him of the right to insist that his liability ended with the first prosecution, Ricketts v. Adamson,483 U.S. 1, 107 S.Ct. 2680, 97 L.Ed.2d 1 (1987) (reinstatement of higher charge after breach of agreement on plea to lower charge);Jeffers v. United States, 432 U.S. 137, 97 S.Ct. 2207,53 L.Ed.2d 168 (1977) (separate trial on lesser included offense after defendant opposed joinder of offenses in first trial) (the "sword exception" mentioned by the Second Circuit Court of Appeals in United States v. Quinones, supra).
Because we do not believe that in Corbin the Supreme Court meant to implicitly overrule this body of double jeopardy law, we conclude that the "has already been prosecuted" language inCorbin must be read narrowly as "has already been convicted or acquitted" and must be confined *Page 189 
to the facts of that case and the precedents upon which it relied.
The third reason why we do not consider Corbin controlling is because, even if the dismissal of the conspiracy indictment against Cox were treated as an acquittal, that dismissal did not resolve any issue of ultimate fact raised by the indictment for murder. Therefore, the State was not collaterally estopped from litigating, in the murder prosecution, conduct which formed the basis for the conspiracy prosecution.
In Corbin itself, and in all of the cases upon which it relied (principally Illinois v. Vitale, 447 U.S. 410,100 S.Ct. 2260, 65 L.Ed.2d 228 (1980); Brown v. Ohio, 432 U.S. 161,97 S.Ct. 2221, 53 L.Ed.2d 187 (1977); Ashe v. Swenson,397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970); In re Nielson,131 U.S. 176, 9 S.Ct. 672, 33 L.Ed. 118 (1889); and Harris v.Oklahoma, 433 U.S. 682, 97 S.Ct. 2912, 53 L.Ed.2d 1054 (1977)), the former prosecution had proceeded to a verdict of either conviction or acquittal by the factfinder. Each of the former prosecutions ended in a final judgment resolving issues of factual guilt or innocence involving the conduct of the defendant.
Here, Cox's conspiracy trial did not result in a verdict of guilt or innocence, and the factfinder did not resolve an issue of ultimate fact or render a decision concerning Cox'sconduct. Cox's trial was terminated and the indictment dismissed, upon Cox's motion, before those issues were ever submitted to the jury. The trial court rendered a decision only that the indictment had been brought too late, and that this defect required a dismissal of the charge. The procedural posture of Cox's prosecution for conspiracy was thus very different from that of Corbin or the cases upon which Corbin
relied. This difference removes this case from the sphere of operation of Corbin.
Thus, although the Corbin Court phrased its prohibition against a successive prosecution in terms of "conduct that constitutes an offense for which the defendant has already beenprosecuted," Corbin should, in our judgment, be interpreted narrowly to mean that a successive prosecution is barred "if, to establish an essential element of an offense charged in that prosecution, the government will prove conduct that constitutes an offense for which the defendant has already been" convicted
or acquitted.
This interpretation of the Corbin holding is consistent with the fact that Corbin deals with the collateral estoppel component of double jeopardy and has been classified as an "issue preclusion" case. See, e.g., Lucido v. Superior Court,51 Cal.3d 335, 272 Cal.Rptr. 767, 781, 795 P.2d 1223, 1238
(1990) (Mosk, J., dissenting); People v. Winston, 200 Ill. App.3d 296, 146 Ill.Dec. 810, 558 N.E.2d 773, 775, appeal denied, 135 Ill.2d 565, 151 Ill.Dec. 391, 564 N.E.2d 846 (1990); Harrelson v. State, 569 So.2d 295, 297 (Miss. 1990);State v. Wacaser, 794 S.W.2d 190, 195 (Mo. 1990).
Collateral estoppel, or "issue preclusion" means that
 "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit."
Ashe v. Swenson, 397 U.S. 436, 443, 90 S.Ct. 1189, 1194,25 L.Ed.2d 469 (1970). See also Brown v. Ohio, 432 U.S. 161,166-67 n. 6, 97 S.Ct. 2221, 2226 n. 6, 53 L.Ed.2d 187 (1977) (The double jeopardy clause bars a second prosecution which "requires the relitigation of factual issues already resolved by the first [prosecution].").
Here, even if the dismissal of the conspiracy indictment were considered an "acquittal," the fact remains that the dismissal did not resolve any issues of factual guilt or innocence raised by the murder indictment. See United States v. Vidal-Hungria,794 F.2d 1503, 1512 (11th Cir. 1986) (Government not estopped from relitigating conduct in second prosecution which formed the basis for the first prosecution. Although the termination of the first prosecution was deemed an "acquittal" because Government failed to establish a "material element of offense," the outcome of the first prosecution did not "necessarily resolve in favor of [accused] any issue of *Page 190 
ultimate fact raised by the second indictment"). The only "issue determined" by the dismissal of Cox's first indictment was that the statute of limitations for conspiracy had run, and that "issue" was not "relitigated" at the murder trial.
Because the defendant's first prosecution did not end in a verdict of conviction or acquittal and did not resolve issues of factual guilt raised by the murder indictment, we consider the double jeopardy problem posed by the successive prosecutions here to be more closely analogous to United Statesv. Scott, 437 U.S. 82, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978).
In that case, the United States Supreme Court rejected a double jeopardy challenge to the Government's appeal following the trial judge's midtrial dismissal of an indictment on the ground of prejudicial preindictment delay. An appeal by the Government from the dismissal of a criminal prosecution is permissible, under 18 U.S.C. § 3731, "so long as further prosecution would not be barred by the Double Jeopardy Clause."Serfass v. United States, 420 U.S. 377, 387, 95 S.Ct. 1055,1062, 43 L.Ed.2d 265 (1975). Thus, Scott is procedurally analogous here because, for purposes of jeopardy, the right of the prosecution to appeal and the right of the prosecution to retry a defendant following the dismissal of a former indictment are coextensive.
The accused in Scott, a police officer, was indicted for the distribution of narcotics. Once before trial and twice during trial, the accused moved for dismissal of the indictment on the ground that his defense had been prejudiced by preindictment delay. At the close of all the evidence, the court granted his motion. The Government's appeal was dismissed on the basis that further prosecution after a ruling in defendant's favor was barred by the Double Jeopardy Clause. Scott, 437 U.S. at 84,98 S.Ct. at 2190.
The Supreme Court reversed, holding that "where the defendant himself seeks to terminate the trial before verdict on grounds unrelated to factual guilt or innocence," principles of double jeopardy do not bar his retrial. Scott, 437 U.S. at 87,98 S.Ct. at 2191. Observing that "the law attaches particular significance to an acquittal," Scott, 437 U.S. at 91,98 S.Ct. at 2194, the Court held that although the dismissal of the indictment was a final judgment favorable to the accused, it was, nevertheless, not an acquittal. "[A] defendant is acquitted only when 'the ruling of the judge, whatever its label, actually represents a resolution [in the defendant's favor], correct or not, of some or all of the factual elements of the offense charged.' " Scott, 437 U.S. at 97,98 S.Ct. at 2197 (quoting United States v. Martin Linen Supply Co.,430 U.S. 564, 571, 97 S.Ct. 1349, 1355, 51 L.Ed.2d 642 (1977)).
Here, as in Scott,
 "the question of the defendant's factual guilt or innocence . . . was [not] actually submitted to the jury as a trier of fact; in the present case [the accused] successfully avoided such a submission . . . by persuading the trial court to dismiss [the indictment] on a basis which did not depend on guilt or innocence. He was thus neither acquitted nor convicted, because he himself successfully undertook to persuade the trial court not to submit the issue of guilt or innocence to the jury which had been empaneled to try him."
Scott, 437 U.S. at 99, 98 S.Ct. at 2198.
The majority in Scott determined that the "dismissal of an indictment for preindictment delay represents a legal judgment that a defendant, though criminally culpable, may not be punished because of a supposed constitutional violation."Scott, 437 U.S. at 98, 98 S.Ct. at 2197. Similarly, the discharge of an accused on the ground that his prosecution is barred by the statute of limitations represents a legal determination that, although the accused may have committed acts constituting a crime, he may not be held liable because of the policy underlying the statute of limitations. In UnitedStates v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468
(1971), the Court stated:
 "The motion to dismiss rested on grounds that had nothing to do with the guilt or innocence or the truth of the allegations in the indictment but was, *Page 191 
rather, a plea in the nature of confession and avoidance, that is, where the defendant does not deny that he has committed the acts alleged and that the acts were a crime but instead pleads that he cannot be prosecuted because of some extraneous factor, such as the running of the statute of limitations or the denial of a speedy trial."
Marion, 404 U.S. at 312, 92 S.Ct. at 459.
Justice Brennan, who was joined by three other justices in dissenting in Scott, argued that "[t]he Court's attempt to draw a distinction between 'true acquittals' and other final judgments favorable to the accused" was illogical.437 U.S. at 103, 98 S.Ct. at 2200. The dissent pointed out that unconstitutional preindictment delay gave the accused "a complete defense to the charges," id.; did not require the resolution of purely legal, but also factual, issues; and
 "like a host of other principles and policies of the law — e.g., entrapment, insanity, right to speedy trial, statute of limitations — operates to preclude the imposition of criminal liability on defendants, notwithstanding a showing that they committed criminal acts."
Scott, 437 U.S. at 111, 98 S.Ct. at 2204 (Brennan, J., dissenting).
Referring to the statute of limitations as a "traditional factual defense," Justice Brennan observed that it is "routinely submitted to the jury . . . [i]n any case in which the date upon which the defendant committed the crime is disputed and may have been outside the statute of limitations provided by law." Scott 437 U.S. at 115, n. 10,98 S.Ct. at 2206, n. 10.
In the present case, there appears no factual dispute that the prosecution for conspiracy to commit murder was barred by the statute of limitations. The statute of limitations was, as in Scott, a "complete defense to the [conspiracy] charges," but it was not, under the circumstances presented here, a "factual defense." Consequently, had a motion alerting the trial court to the statute of limitations problem been made prior to the1985 conspiracy trial, the defendant could have averted ever having been placed in jeopardy.[1] We note, there is no indication in the court reporter's transcript for Cox's first trial for murder (the mistrial), which was made an exhibit on the appeal for his second trial, that the issue of jeopardy was raised at that first trial.
It has been observed that a defendant can not be "faulted for not having raised [an] issue prior to the time that jeopardy attached" where a ruling in the defendant's favor "wouldnot have barred conviction on the existing charge." 3 W. LaFave J. Israel, Criminal Procedure § 24.3 at 82 (1984) (emphasis added). That commentary further observes:
 "[A]ll that remains unresolved is what the outcome should be in the unlikely event that defendant's contention, had it been raised and prevailed before trial, would have been deemed to bar further prosecution, but it is first raised during trial and then becomes intermixed with evidence sufficiency issues and thus is disposed of by what is styled an acquittal."
Id. (Emphasis added.)
That "unlikely event" has occurred in this case. AlthoughScott does not definitively *Page 192 
"resolve" what the outcome should be, we think it and other cases point strongly to the result we reach here. Even Justice Brennan, dissenting in Scott, noted that it
 "might not be objectionable to permit retrial of a defendant whose first trial was terminated on the basis of a midtrial ruling on a motion that could — because it did not depend upon the facts adduced at trial — have been raised before jeopardy attached."
437 U.S. at 112, 98 S.Ct. at 2205 (Brennan, J., dissenting). See also Lee v. United States, 432 U.S. 23, 35, 97 S.Ct. 2141,2148, 53 L.Ed.2d 80 (1977) (Brennan, J., concurring) ("[A]n entirely different case would be presented if the petitioner had afforded the trial judge ample opportunity to rule on his motion prior to trial, and the court, in failing to take advantage of this opportunity, permitted the attachment of jeopardy before ordering the dismissal of the information");Serfass v. United States, 420 U.S. at 394, 95 S.Ct. at 1065 ("[W]e [do not] intimate any view concerning the case put by the Solicitor General, of 'a defendant who is afforded an opportunity to obtain a determination of a legal defense prior to trial and nevertheless knowingly allows himself to be placed in jeopardy before raising the defense.' ").
In our opinion, interpreting the phrase "has been prosecuted" to mean "has been convicted or acquitted" conforms with the facts of Corbin itself and the authorities cited therein. It avoids the totally unacceptable conclusion that the Court tacitly obliterated significant and settled areas of double jeopardy law. Furthermore, our interpretation encompasses the first two oft-repeated protections embodied in the Double Jeopardy Clause, quoted in Grady:
 "The Double Jeopardy Clause embodies three protections: 'It protects against a second prosecution for the same offense after acquittal.
It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense.' North Carolina v. Pearce, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969)."
Grady v. Corbin, 495 U.S. at ___, 110 S.Ct. at 2090,109 L.Ed.2d at 561 (emphasis added).
Finally, we note that our holding that the "has already been prosecuted" language of Corbin must be construed to mean "has already been convicted or acquitted" is consistent with Ala. Code 1975, § 13A-1-8(b)(2). That section provides:
 "(b) When the same conduct of a defendant may establish the commission of more than one offense, the defendant may be prosecuted for each such offense. He may not, however, be convicted of more than one offense if:
 "(2) One offense consists only of a conspiracy or other form of preparation to commit the other."
(Emphasis added.)
We hold that under the circumstances of this case, the midtrial dismissal of the conspiracy indictment on the ground that it was barred by the statute of limitations was not an "acquittal," did not resolve questions relating to the defendant's factual guilt (his conduct), and did not, underGrady v. Corbin, bar his later prosecution for murder.
 B.
In connection with this first issue, the State argues that jeopardy never attached to Cox's trial for conspiracy because the circuit court never acquired jurisdiction over the prosecution. The Attorney General maintains that because of the bar of the statute of limitations, the prosecution for conspiracy was void from the very beginning, and must be treated as if it never occurred.
"It is essential to constitute jeopardy that the court in which the accused is put upon his trial shall have jurisdiction. If it is without jurisdiction, there can be no valid conviction, and hence there is no jeopardy." Cox [AnthonyG.] v. State, 462 So.2d 1047, 1051 (Ala.Cr.App. 1985).
 "Protection from prosecution under a statute of limitations is a substantive right. Under some, but not all, authorities, the limitation so fixed is jurisdictional *Page 193 
and the time within which the offense is committed is a jurisdictional fact, it being necessary that the indictment or information be actually filed within the time prescribed. Under such statutes a substantive statute of limitation question is properly raised at any time."
22 C.J.S. Criminal Law § 196 at 240-41 (1989) (footnotes omitted).
 "Two different views are to be found as to the effect of the running of the applicable statute of limitations in a criminal case. One is that this is a matter of affirmative defense, meaning that the requirements of timely objection and the like which ordinarily apply to the raising of such a defense must be complied with. The other is that once the time has run the court is without jurisdiction to try the offense, which means, for example, that a defendant would be entitled to relief even if he had previously entered an otherwise valid plea of guilty."
W. LaFave and J. Israel, 2 Criminal Procedure § 18.5(a) at 426-27 (1984) (footnotes omitted).
The prevailing, but not unanimous, federal view is that the statute of limitations is an affirmative defense. SeeUnited States v. Karlin, 785 F.2d 90, 91-92 (3d Cir. 1986), cert. denied, 480 U.S. 907, 107 S.Ct. 1351, 94 L.Ed.2d 522
(1987), noting that the Sixth and Tenth Circuit federal courts of appeal have adopted the position that the statute of limitations is jurisdictional, while the Second, Third, Fourth, Seventh, Ninth, and D.C. Circuits have held that the running of the statute of limitations does not defeat jurisdiction and that the failure to assert the statute will constitute a waiver.
The opinions of the courts of this State have generated considerable uncertainty as to which position is followed in Alabama. The following cases tend to support the position that the statute of limitations is a jurisdictional matter which cannot be waived: Spears v. State, 26 Ala. App. 376, 160 So. 727
(1935); McDowell v. State, 61 Ala. 172 (1878); Carter v. State,107 Ala. 146, 18 So. 232 (1895); City of Birmingham v. Brown,13 Ala. App. 654, 69 So. 263, reversed on other grounds,195 Ala. 79, 70 So. 718 (1915); Hines v. State, 516 So.2d 937
(Ala.Cr.App. 1987). On the other hand, there are other cases which tend to support the position that the statute of limitations is a matter which can be waived by failure to object. Letcher v. State, 159 Ala. 59, 48 So. 805 (1909); Hallv. State, 497 So.2d 1145 (Ala.Cr.App. 1986); Sanford v.State, 23 Ala. App. 341, 125 So. 603 (1929); Hendricks v. State,11 Ala. App. 207, 65 So. 682 (1914); Webb v. State, 19 Ala. App. 359,97 So. 246 (1923); Enlow v. State, 15 Ala. App. 100,72 So. 571 (1916); Carroll v. State, 468 So.2d 186 (Ala.Cr.App. 1985);Wilkie v. State, 41 Ala. App. 358, 132 So.2d 390 (1961).
Although Alabama law is not entirely clear on the question whether a court presiding over a prosecution barred by the statute of limitations is without "jurisdiction," a synthesis of the Alabama cases indicates that a statute of limitations defect must be considered "jurisdictional," in the sense that the trial court is not authorized to pronounce the accused guilty of the time-barred offense. Notwithstanding the fact that in certain special circumstances where the bar of the statute may be expressly waived when it does not operate in the defendant's favor, see Spaziano v. Florida, 468 U.S. 447,104 S.Ct. 3154, 82 L.Ed.2d 340 (1984); Hall v. State,497 So.2d 1145 (Ala.Cr.App. 1986), under ordinary circumstances the bar of the statute is not waived by a mere failure to assert it, and the statute of limitations may be properly asserted on appeal or in a petition for post-conviction relief.
However, here the circuit court obviously acquired subject-matter jurisdiction over the conspiracy offense to the degree that the court had the power and the authority to dismiss the prosecution because it was barred by the statute of limitations. Cf. Serfass v. United States, 420 U.S. at 389, 95 S.Ct. at 1063 ("At no time during or following the hearing on petitioner's motion to dismiss the indictment did the District Court have jurisdiction to do more than grant or deny thatmotion, and neither before nor after the ruling did jeopardy attach." (Emphasis added)). Instead of *Page 194 
alleging that the circuit court had no subject-matter jurisdiction over the conspiracy prosecution, it is more accurate to state that, once the court was shown that the prosecution was barred by the statute of limitations, the court had no "jurisdiction to try the question of the guilt or innocence of the accused." Serfass v. United States, 420 U.S. at 391, 95 S.Ct. at 1064, (quoting Kepner v. United States,195 U.S. 100, 133, 24 S.Ct. 797, 806, 49 L.Ed. 114 (1904)).
We therefore conclude, as an alternate basis for upholding defendant's murder conviction, that the defendant was not in jeopardy at the conspiracy trial because under Alabama law the indictment for the time-barred offense conferred no jurisdiction on the trial court to adjudicate his guilt thereunder — or, had he been found guilty, constituted grounds for relief on appeal or writ of error coram nobis (now Rule 32, A.R.Crim.P.), even in the absence of an objection.
 II.
During the defendant's 1988 trial for murder, codefendant Bennie Hays, the defendant's father-in-law, collapsed during the course of the trial and was rushed to the hospital with an apparent heart attack. The trial judge declared a mistrial and discharged the jury. Cox maintains that principles of double jeopardy barred his 1989 trial for murder because there was no "manifest necessity" for the declaration of the mistrial.
The record reveals that on the fifth day of trial, during the cross-examination of State's witness James "Tiger" Knowles, codefendant Hays fell to his knees. Hays' counsel called out, "Judge. Judge. Mr. Hays is having problems, he's going to have to leave." The jury was removed from the courtroom, the paramedics were called, and Hays was taken by ambulance to the University of South Alabama Hospital.
The State moved for a mistrial as to both defendants, arguing that the episode was "bound to evoke sympathy," not only for Hays, but for his son-in-law Cox. The prosecution insisted that it would be humanly impossible for "the jury having seen what they saw, . . . to render a verdict in this case, based solely on the law and solely on the evidence."
Both counsel for Hays and counsel for Cox strenuously opposed the declaration of a mistrial.[2] Hays' counsel sought to waive his client's right to be present for the remainder of the trial. He argued that Hays had, in fact, already personally waived that right:
 "From day one, I have expressed that Mr. Hays waives his presence, and Your Honor asked Mr. Hays, you said, 'Is that true, Mr. Hays,' and he said, 'Yes.' And from the time I have gotten involved in this case, I've talked to Mr. Hanley [counsel for Cox], I've talked to Frank Cox, I've talked to Gail Cox, the daughter of Mr. Hays, and we have been concerned about his health. Because, quite frankly, if he dies, it's because of this trial, because he has not been able to take the stress, and we have been very concerned about that all along. And in being so concerned, we have discussed with him, and I can tell you it was an intelligent and knowing discussion with him, the fact that he may have to exit from the Courtroom, if he feels bad. And he said, 'Yes, I understand that, but [I] want to go on with the trial. I want to get this over with. It is killing me. This trial is killing me, the anticipation is killing me. I've got to get it over with one way or another.'
 "In view of that, I came up to Your Honor, and I said, 'Judge, there may be occasions when Mr. Hays may have to leave. He's a sick man.' You asked Mr. Hays is that correct, do you want to waive your presence, and he said he did.
 "THE COURT: I'm not sure — I'm not sure if I asked Mr. Hays that question or you asked Mr. Hays that question. *Page 195 
 "MR. BRUTKIEWICZ [Counsel for Hays]: But you recall that it was asked —
 "THE COURT: But I think the question was asked, and I think the answer was given, but I'm not sure if I asked that question, or you asked Mr. Hays that question. But the record will speak for itself, whatever the record says.
 "MR. BRUTKIEWICZ: When Mr. Hays was feeling ill, . . . I talked to Mr. Hays, and I said, 'Are you going to be okay?' 'No,' he said, 'No, I need to get some air.' I said 'Do you want me to stop this trial?' 'No. Go on. Go on.' He was laying on the ground, he had an oxygen mask on him, and the ambulance came, and the ambulance people came and put him on a stretcher and I walked out with him and he said, 'Come here.' I said, 'What is it?' And he said, 'Keep fighting. Go on, get this over with.'
 "Judge, there has been an express, knowing and intelligent waiver. As an officer of the Court, I am here before you to tell you that I have discussed it with Mr. Hays. He understands his rights, with regard to being present. And . . . he has voluntarily waived his presence here in the Courtroom."
Arguing that State's witness Knowles had been vigorously cross-examined and had admitted perjury on the stand, Hays' counsel informed the court that he wanted to continue to a verdict because of his belief that the case was "going heavily against the State of Alabama at this point."
Responding to the State's position that the jurors would be swayed by sympathy for the stricken Hays, defense counsel claimed that during voir dire the District Attorney had specifically asked the venire-members whether the fact that Hays was "old and in ill health" would affect their deliberations. According to counsel for Hays, the response was negative. We do not have the voir dire of the jury in the record before us.
Counsel for Hays also pointed out that declaring a mistrial would not solve the problem of Hays' physical condition: "The longer this case [goes] on, the older the old man [is] going to get, and the worse condition he [is] going to be in. We want
to get the case over with."
Cox's counsel reminded the court that he had opposed the consolidation of the cases against the two defendants. However, after Hays' collapse, he stated that he "expressly object[ed]" to a severance. Cox had previously argued that the prejudicial effect of certain hearsay statements admissible against Hays but not admissible against Cox could not be eradicated by limiting instructions. The court, nevertheless, had allowed the evidence and had given limiting instructions. Counsel for Cox maintained that "because the evidence [admissible only against Hays] has already come in," a severance "wouldn't be proper." He insisted that the trial of both defendants should go forward in Hays' absence and he gave his opinion that "any other ruling would be jeopardy."
After hearing arguments of counsel, the trial judge stated that he was "not going to rule on this issue before lunch" because he "want[ed] to give this matter serious consideration before [he] ma[de] any ruling at all." During the noon recess, the court ascertained that Hays had been admitted to the hospital in "guarded but stable" condition with pains "consistent with cardiac pains." The attending physician stated that Hays had damage to his heart, but he was unable to tell whether the damage was recent or was tied to Hays' previous heart problems which had necessitated a triple bypass operation two years earlier. The doctor stated that Hays would not be released from the hospital for at least a week.
Before making his ruling, the trial judge said that he had considered the fact that the jury was sequestered. He stated that he had been thinking of "unsequestering" the jury with strong admonitions and continuing the case for a week to determine whether Hays' condition improved. However, he concluded that even if Hays were released from the hospital within a week, he could not envision "any doctor who specializes in heart conditions . . . advising Mr. Hays to come back to the rigors of this *Page 196 
trial." He therefore concluded that a mistrial was the only alternative open to him, explaining his ruling as follows:
 "I do not feel that I can waive the presence of Mr. Hays during the time of this trial, when he is charged with murder. Which punishment can be up to life in the penitentiary. I feel that he has a right to be present, to face his witnesses, to testify, if he so desires, and also, to be able to confront his . . . accusers, and also, to present his evidence, and also to be able to confer with his attorney. Which obviously he could not do, if he were in the hospital.
 "Therefore, that argument, as raised by the attorney for Mr. Hays, who says that he has previously waived his presence during the course of the trial, I do not feel that it would be fair under our Constitution, to Mr. Hays.
 "Relative to whether or not the Court would consider even severing the case at this point, and proceeding with the trial of Mr. Cox, and not Mr. Hays, the Court determined that that would not be the proper thing to do since throughout the entire trial, the Court has consistently allowed evidence which would be against Mr. Hays to be introduced into this Court, even though the Court had admonished you a number of times to keep it separate, that it would not be admissible against Mr. Cox. And I think there would be a question as to whether or not Mr. Cox would be able to receive a fair trial, in the event there were to be a conviction.
 "And the State too, is entitled to a fair trial, the same as the Defendants are entitled to a fair trial.
 "For all of these reasons, the Court determines that it would be impossible to continue on with this trial. And for the reasons stated thus far, and for the other reasons as stated by the Court to the attorneys, the Court feels that it is left with no other alternative but to declare a mistrial in this case."
The Double Jeopardy Clause protects a defendant's "valued right to have his trial completed by a particular tribunal."United States v. Jorn, 400 U.S. 470, 484, 91 S.Ct. 547, 557,27 L.Ed.2d 543 (1971) (quoting Wade v. Hunter, 336 U.S. 684, 689,69 S.Ct. 834, 837, 93 L.Ed. 974 (1949)). A defendant may waive this protection by requesting or by consenting to a mistrial before a verdict is rendered. See United States v. Dinitz,424 U.S. 600, 607, 96 S.Ct. 1075, 1079-80, 47 L.Ed.2d 267 (1976);United States v. Jorn, 400 U.S. at 485, 91 S.Ct. at 557. If, however, the defendant does not consent to a mistrial, he may still be retried without running afoul of the Double Jeopardy Clause, if there is a "manifest necessity" for a mistrial.Arizona v. Washington, 434 U.S. 497, 505, 98 S.Ct. 824, 830,54 L.Ed.2d 717 (1978). The Supreme Court cautioned that the phrase "manifest necessity" cannot be interpreted literally; only a "high degree" of necessity is required before concluding that a mistrial is appropriate. Arizona v. Washington,434 U.S. at 506, 98 S.Ct. at 831. "Manifest necessity for a mistrial is not determined by whether in fact the event precipitating the mistrial did influence the juror, but whether it might have unlawfully influenced the juror." Woods v. State,367 So.2d 982, 984 (Ala. 1978). A trial court's finding of "manifest necessity" should be upheld on appeal if the court exercised "sound discretion" in making the determination. Arizona v.Washington, 434 U.S. at 514, 98 S.Ct. at 835; Woods,367 So.2d at 983-84. "A trial court's ruling on a motion for a mistrial is reviewable on appeal . . .; however, such a motion is addressed to the sound discretion of the trial court, and its ruling will not be reversed in the absence of a clear showing of abuse of discretion." Ex parte Jefferson, 473 So.2d 1110,1114 (Ala.), cert. denied, 479 U.S. 922, 107 S.Ct. 328,93 L.Ed.2d 300 (1985).
Cox argues that the trial court did not exercise sound discretion in making the determination that there was a manifest necessity for the mistrial. He insists that the trial judge disregarded the facts 1) that Hays had waived his right to be present, 2) that both defendants believed the case was "going heavily against the State of Alabama" and were deprived of the opportunity *Page 197 
to proceed to a favorable verdict, and 3) that the court's finding that Cox would not be able to receive a fair trial if his case was severed was inconsistent with the court's earlier ruling that limiting instructions were sufficient to cure the prejudice to Cox arising from the receipt of evidence admissible against Hays but not against Cox. We shall address these arguments in the order presented.
In Taylor v. Illinois, 484 U.S. 400, 108 S.Ct. 646,98 L.Ed.2d 798 (1988), the Supreme Court observed that a defendant's right to be present at trial is one of those "basic rights that the attorney cannot waive without the fully informed and publicly acknowledged consent of the client."484 U.S. at 417-18, n. 24, 108 S.Ct. at 657, n. 24. Thus, unless the trial judge believed that Hays himself had waived his right to be present at trial, the court would have been justified in finding counsel's attempted waiver ineffectual.
Although we have some doubt whether a previous waiver made by codefendant Hays, in contemplation of a temporary absence from the courtroom, would extend to the more drastic situation that resulted when Hays collapsed and was rendered permanently absent from the remainder of the trial, we assume without deciding that Hays personally and publicly acknowledged a desire to relinquish his right to continuous presence. Having said that, however, it does not follow that the trial court erred in rejecting Hays' waiver.
 "Although it has sometimes been argued that a defendant should have a right to be absent from his trial if he so chooses, the law generally is to the contrary. 'The ability to waive a constitutional right does not ordinarily carry with it the right to insist upon the opposite of that right,' [Singer v. United States, 380 U.S. 24, 34-35, 85 S.Ct. 783, 790, 13 L.Ed.2d 630 (1965)] and thus it does not follow from the fact that the right of presence can be waived or forfeited that a defendant can insist upon a right not to attend his trial."
3 W. LaFave and J. Israel, Criminal Procedure § 23.2(c) at 9 (1984) (emphasis added) (footnotes omitted). In Carter v.State, 102 Nev. 164, 170, 717 P.2d 1111, 1114 (1986), the codefendants sought to waive the conflict of interest inherent in being represented by the same defense counsel. The court acknowledged that right of waiver, but held: "This right of waiver, however, cannot preclude a trial court from declaring a mistrial when there is a manifest necessity for doing so." Id.
In Dunkerley v. Hogan, 579 F.2d 141 (2d Cir. 1978), cert. denied, 439 U.S. 1090, 99 S.Ct. 872, 59 L.Ed.2d 56 (1979), the court held that retrial following a mistrial declared over the objection of the accused, who was hospitalized for a collapsed lung on the third day of trial, was precluded by the Double Jeopardy Clause. In Dunkerley, three doctors agreed that the accused would be hospitalized for a 7- to 10-day period. The accused, like the defendants here, believed that "the trial was going particularly well" for him and sought to waive his presence during the period of hospitalization. 579 F.2d at 143. The prosecution, like the District Attorney here, opposed the idea of proceeding without the accused. Defense counsel then suggested that the jury be de-sequestered and the trial continued for 7 to 10 days, after which the trial could be resumed or the situation further reviewed. The trial court summarily rejected the idea of granting a continuance and instead, sua sponte, declared a mistrial. The court stated, as the only reason for its action, that it wanted to "insure a fair trial for the defendant here . . . in the interest of justice." Dunkerley, 579 F.2d at 144.
We find Dunkerley distinguishable on three grounds. First, the State did not object to the continuance or seek a mistrial in Dunkerley, whereas here, the State sought the mistrial on grounds of juror partiality, claiming that sympathy for Hays and his son-in-law Cox prevented the prosecution from receiving a fair trial. Second, in Dunkerley the trial judge did not suggest that granting a continuance would be "unfeasible . . . or unreasonable under the circumstances." 579 F.2d at 147. Here, the trial court stated his opinion that a continuance would be unreasonable because *Page 198 
he doubted that "any doctor who specializes in heart conditions . . . [would] advis[e] Mr. Hays to come back to the rigors of this trial." Third, the record in Dunkerley established no "evidence or statement by the court" indicating why "the apparent availability of at least one alternative to a mistrial — adjourning the trial for 7 to 10 days" was rejected.579 F.2d at 148. In the present case, the trial judge explicitly stated his reasons for rejecting the alternatives of granting either a continuance or a severance.
While Hays had the right to waive his presence at trial, he did not have the right to insist on being tried in absentia if his absence compromised the right of the opposing party to receive a fair trial. "[A] defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments." Arizona v. Washington,434 U.S. at 503 n. 11, 98 S.Ct. at 829 n. 11 (quoting Wade v.Hunter, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974
(1949)). "The right to the disinterested objective judgment of the trier of the fact applies to all litigants to a controversy, the prosecution no less than the defense." Lopezv. Criminal Court, 566 F. Supp. 792, 794 (S.D.N.Y. 1983) (concern expressed by judge in nonjury trial that accused cab driver might lose his license if convicted "reflect[ed] that sympathetic considerations might well have been injected into the fact finding process" and demonstrated manifest necessity for mistrial). Just as "[n]either party has a right to have his case decided by a jury which may be tainted by bias," Arizonav. Washington, 434 U.S. at 516, 98 S.Ct. at 835-36, so neither party has a right to insist on being tried by a jury which may be swayed by sympathy. Sympathy and bias are opposite sides of the same coin of partiality. The presence of either undermines "the public interest that all parties, prosecution and defense alike, be afforded a fundamentally fair trial at which the disputed fact issues are decided by an impartial and objective fact finder." Lopez v. Criminal Court, 566 F. Supp. at 795.
Although we do not have the record of the jury voir dire before us, we accept as accurate defense counsel's rendition of the fact that the District Attorney asked and received a negative answer to the question whether Hays' being "old and in ill health" would affect the jury's deliberations. However, we do not believe that the trial court was bound to extend this pretrial denial of partiality to the subsequent dramatic events which occurred here, nor do we believe that the trial court was required to poll the jury to determine its reaction to Hays' collapse before inferring that, as the State argued, the episode was "bound to evoke sympathy" for both defendants.
 "The 'impartiality [of a juror] is not a technical concept. It is a state of mind.' The state of one's mind requires a fact determination as does the state of one's digestion. This determination involves an evaluation of a variety of factors and all the surrounding circumstances and the fair inferences to be drawn therefrom. The trial judge was not bound to accept at face value the juror's expurgatory statement."
Lopez v. Criminal Court, 566 F. Supp. at 795 n. 8 (quoting St.Lawrence v. Scully, 523 F. Supp. 1290, 1299 (S.D.N.Y. 1981), affirmed, 697 F.2d 296 (2d Cir. 1982)).
While polling the jury might have been the better practice here, our scope of review requires that we "accord the highest degree of respect to the trial judge's evaluation of the likelihood that the impartiality of one or more jurors may have been affected by" Hays' collapse. Arizona v. Washington,434 U.S. at 511, 98 S.Ct. at 833.
In Washington, a mistrial was declared because the trial court determined that defense counsel's improper opening argument had biased the jury against the prosecution. This mistrial was held to be manifestly necessary despite the lack of an "express determination or evaluation by the trial court of the degree of prejudice caused by the improper remarks."434 U.S. at 523, 98 S.Ct. at 839 (Marshall, J., dissenting). TheWashington Court relied *Page 199 
on two cases in which the jury was not polled regarding the existence of bias before a mistrial was declared:
 "Simmons v. United States, 142 U.S. 148
[12 S.Ct. 171, 35 L.Ed. 968, (1891)], involved the possibility of bias caused by a newspaper story describing a letter written by defense counsel denying a charge by a third party that one of the jurors was acquainted with the defendant. Without determining the truth or falsity of the charge and without examining the jurors to ascertain what influence the story had upon them, the trial judge declared a mistrial because he considered it ' "impossible that in the future consideration of this case by the jury there can be that true independence and freedom of action on the part of each juror which is necessary to a fair trial of the accused." ' Id., at 150 [12 S.Ct. at 171]. This Court affirmed, holding that the judge was justified in concluding that the publication of the letter had made it impossible for the jury 'to act with the independence and freedom on the part of each juror requisite to a fair trial of the issue between the parties.' Id., at 155 [12 S.Ct. at 172].
 "In Thompson v. United States, 155 U.S. 271, 279
[15 S.Ct. 73, 75-76, 39 L.Ed. 146, (1894)], the Court concluded that a mistrial was required when it was revealed that one of the trial jurors had served on the grand jury that indicted the defendant. Since it is possible that the grand jury had heard no more evidence — and perhaps even less — than was presented at the trial, and since the juror in question may have had no actual bias against the defendant, the record did not demonstrate that the mistrial was strictly 'necessary.' There can be no doubt, however, about the validity of the conclusion that the possibility of bias justified the mistrial."
434 U.S. at 512, 98 S.Ct. at 833-34 (emphasis added).
In the present case, the trial court was warranted in deciding, without polling the jury, that the apparent heart attack of an elderly defendant who had previously undergone triple bypass surgery was an event likely in itself to evoke the sympathy of the jury. The court was also justified in accepting the State's argument that any sympathy the jury might have felt for codefendant Hays extended to his son-in-law Cox. Under the circumstances, it is not unreasonable to infer that there was a real possibility the jury would sympathize with Cox as well as with Hays.
Courts deciding the propriety of a mistrial declared in a joint trial of several defendants have had no difficulty finding that one defendant's "right to a fair trial has been jeopardized because the jurors would infer his 'guilt by association' with" other defendants. See, e.g., United Statesv. Jarvis, 792 F.2d 767, 768 (9th Cir.), cert. denied,479 U.S. 852, 107 S.Ct. 182, 93 L.Ed.2d 116 (1986) (accused could have been prejudiced by inference of "guilt by association" when jurors saw four codefendants shackled); United States v.Bauman, 887 F.2d 546, 551 (5th Cir. 1989), cert. denied,493 U.S. 1077, 110 S.Ct. 1128, 107 L.Ed.2d 1034 (1990) (accused could have been subject to "spillover prejudice" when attorney for codefendants was arrested for aggravated perjury and conspiring to bribe judge). If "guilt by association" and "spillover prejudice" are recognized grounds for the defense to question the factfinder's impartiality, we see no reason why "sympathy by association" and "spillover sympathy," in the case of codefendants who are father-in-law and son-in-law, may not be a basis for the prosecution to doubt the jury's impartiality.
Cox's third argument is that the trial court was inconsistent in the assumptions underlying its rulings on the admission of evidence and its ruling on the necessity for the mistrial. In substance, we understand Cox's argument to be as follows: In allowing hearsay which was not admissible as to Cox, the court assumed that limiting instructions to the jury would cure any prejudice to Cox, whereas in granting the mistrial as to Cox the court stated that because the hearsay had been admitted there was a "question as to whether or not Mr. Cox would be able to receive a fair trial." The court's ruling on *Page 200 
the mistrial thus appears to undercut the propriety of its earlier evidentiary rulings.
Initially, we observe that the correctness of the court's evidentiary rulings was not at issue at the time the mistrial was declared, and it is not at issue here. However, "the record speaks for itself in connection with manifest necessity, and the trial court's mistrial ruling is entitled to great deference irrespective of any statement of reasons by the trial court." United States v. Mastrangelo, 662 F.2d 946, 950 (2d Cir. 1981), cert. denied, 456 U.S. 973, 102 S.Ct. 2236,72 L.Ed.2d 847 (1982). Moreover, after contemplating Hays' collapse and the prospect of trying Cox separately, the trial court may have reassessed the correctness of its earlier evidentiary rulings.
 "Contrary to what the defendant suggest[s], double jeopardy jurisprudence does not bar a judge's reassessment of the impact of certain events. Unless we are convinced from our review of the record that the trial judge is belatedly searching for manifest necessity where none existed at the trial's termination, we find no interest to be served by shielding criminal defendants from reprosecution because of a judge's fortuitous choice of words. Thus, the proper analysis focuses upon the complete record and not upon isolated statements of the presiding judge."
United States v. Bauman, 887 F.2d at 552.
The complete record of the events transpiring before and during the decision to grant the mistrial convinces this court that the trial judge exercised the "sound discretion" called for in Arizona v. Washington. Here, as in Washington,
 "[t]he trial judge did not act precipitately in response to the prosecutor's request for a mistrial. On the contrary, evincing a concern for the possible double jeopardy consequences of an erroneous ruling, he gave both defense counsel and the prosecutor full opportunity to explain their positions on the propriety of a mistrial. We are therefore persuaded by the record that the trial judge acted responsibly and deliberately, and accorded careful consideration to respondent's interest in having the trial concluded in a single proceeding. Since he exercised 'sound discretion' in handling the sensitive problem of possible juror [sympathy] created by the [collapse of codefendant Hays], the mistrial order is supported by the 'high degree' of necessity which is required in a case of this kind. Neither party has a right to have his case decided by a jury which may be tainted by [sympathy]; in these circumstances, 'the public's interest in fair trials designed to end in just judgments' must prevail over the defendant's 'valued right' to have his trial concluded before the first jury impaneled."
Arizona v. Washington, 434 U.S. at 515-16, 98 S.Ct. at 835-36
(material in brackets added) (footnotes omitted).
 III.
Although the prosecution presented an extremely weak case of circumstantial evidence, we reject Cox's argument that the prosecution failed to present a prima facie case and that his motion for judgment of acquittal should have been granted.
The State's evidence in this particular case[3] tends to show that around 4:45 on *Page 201 
the morning of Saturday, March 21, 1981, the body of Michael Donald was discovered hanging from a rope tied to a tree on Herndon Avenue in Mobile, Alabama. The body was across the street from 117 Herndon Avenue, the residence of Klansman Henry Hays. Donald had been dead about four hours, plus or minus an hour, before he was hanged. His neck had been cut, he had been beaten, and he had been kicked or stomped about the head. He had some defensive type of cut wounds to his hands. The official cause of death was strangulation and "contributing to it also were the blunt force injuries and sharp force injuries."
Cox was the "exalted cyclops" or president of Ku Klux Klan Unit 900. That unit met on Wednesday nights at the house of Bennie Hays in Theodore, in Mobile County. Bennie Hays was a Klan member and was "pretty high up on the state level." He was a "titan" and "was over the southern units of Alabama." He had an office in Tuscaloosa.
At the meeting held on Wednesday, March 18, 1991, Bennie Hays, Henry Hays, Teddy Lamar Kyser, Tiger Knowles, and Cox were among those present. There was a discussion concerning Josephus Anderson, a black man, who, at that time was being tried in Mobile for killing a white police officer. Newspaper articles were read concerning the trial. Appearing mad and angry, Bennie Hays stated that "if a black man can get away with killing a white man then we ought to hang a nigger," or "if a nigger can get away with killing a white man, a white man ought to get away with killing a nigger." Bennie Hays was the highest ranking Klan member in attendance at that meeting.
Cox nodded his head indicating his agreement with the statement Bennie Hays had made. There was also testimony that, when asked if he agreed with the statement, Cox said, "Yes." Cox then polled the Klan members who all stood up and agreed with the statement made by Bennie Hays. In the parking lot after the meeting, Cox was overheard stating the words, "Nigger ought to be hung."
The Anderson trial ended in a mistrial on the night of Friday, March 20, 1981.
Sometime after work, on the afternoon of that same Friday, Cox and Henry Hays drove to the trailer of Johnny Matthew Jones. Knowles arrived in his pickup truck. Jones was Cox's next door neighbor. Jones considered Cox a friend and thought of him as a "father." Cox had recruited Jones into the Klan. Cox and Knowles went to Jones' trailer. Knowles asked Jones if he could borrow Jones' .22 caliber snubnose revolver. After Cox indicated his approval, Jones loaned the weapon to Knowles. Knowles returned the revolver to Jones around 10:00 that night. One round had been fired from the weapon. The next day, Cox told Jones not to let anyone know that he had let Knowles borrow the weapon.
Later, around dusk, on that same Friday evening of March 20, 1981, Cox, Henry Hays, and Knowles went to the residence of Cox's parents. Cox was with Henry Hays in Hays' automobile. Knowles was driving his pickup truck. Cox asked his mother if he could borrow a rope to tow a car which belonged to Knowles' mother. Cox retrieved some rope from a boat shed and left with Henry Hays in Hays' car. The rope was never returned. Mrs. Cox testified that she asked her son about it the next day and Cox told her that the rope had broken in towing the car. Mrs. Cox also testified that after the hanging, both she and the investigators looked in the boat shed but no one ever found anything that even looked like the type of rope they were looking for. Knowles' mother testified that her car was in good mechanical condition and was not towed on March 20th.
Henry Hays and his wife, Denise, were living in an apartment located at 117 Herndon Avenue in March of 1981. Denise Hays testified that around 5:00 or 5:30 on the afternoon of Friday, March 20, 1981, *Page 202 
Teddy Kyser, Knowles, Henry Hays, and Cox were building wooden crosses in the carport behind 111 Herndon Avenue. At some undetermined time, Cox left by himself. Henry Hays, Knowles, and some other people remained at the apartment playing cards that night.
Cox returned around 11:00 that night, and shortly thereafter, Cox, Kyser, Knowles, and Henry Hays left the apartment. Denise Hays testified that they went to burn the crosses at the courthouse. When they returned in one half hour or so, Cox did not come inside the apartment. Denise Hays testified that Cox went home, and that Henry Hays and Knowles "went out and lynched a black man."[4]
Teddy Lamar Kyser lived at 117 Herndon Avenue with Henry Hays. He testified that Cox was at his residence around 8:00 or 8:30 on the night of Friday, March 20, 1981. According to Kyser, during the evening "[s]ometimes [Cox] left with Henry Hays and sometimes he left with Tiger [Knowles]. Then at one time all three of them left together." Kyser testified that Henry Hays, Knowles, and Cox left the apartment together several times during the evening. When Cox, Henry Hays, and Knowles returned around 12:30 on the morning of March 21, Knowles was "soaked down in blood on his shirt." Cox was "right there along side of him." When Kyser commented on the blood, Knowles ripped off the shirt. Cox told Knowles that there was an extra shirt in his car which Knowles could use. Knowles told Kyser that he had "beat up a fagot."
Kyser testified that later Henry Hays, Knowles, and Cox walked to the carport in the back of 111 Herndon Avenue. Kyser followed. Cox got a cross, gave it to Kyser, and told him to "hold it down low where nobody could see it and put it in the back of Tiger [Knowles'] pickup truck." Around 1:30 or 2:00 that Saturday morning, Kyser and Cox drove to the courthouse. Cox told Kyser where to place the cross. Kyser then did so, doused the cross with diesel fuel, and lit it. They returned to 117 Herndon Avenue about 2:30 or 3:00 that morning. When they arrived, Cox told Kyser to keep his mouth shut about the cross burning. Apparently, Cox went home. There was testimony that he had to be at work at 4:00 that morning.
Kyser saw the body hanging from the tree across the street from 117 Herndon Avenue around 4:45 that morning. Kyser went and woke up Henry Hays. Knowles was still present at that time.
Around 2:00 on the morning of March 21, one man was observed standing next to the open trunk of a black automobile behind the apartment building located at 115-117 Herndon Avenue. There was testimony that Henry Hays drove a black Buick. Another man wearing a hat was observed standing at the corner of a house. There had been testimony that Cox wore a hat. Neither of these men were identified.
Knowles did not testify at this trial. Cox presented no testimony or evidence in his defense.
In their opening statements, both the state and the defense assumed that the actual murder of Michael Donald was committed by Knowles and Henry Hays. On several occasions throughout the course of the trial, defense counsel "stipulated" as to the cause of death and the role of Henry Hays and Knowles in that death. However, the trial judge ruled that there had been only offers to stipulate.
 "THE COURT: But [defense counsel] said that he would stipulate that Tiger *Page 203 
Knowles strangled Michael Donald to death. That he would stipulate that the cause of death was strangulation. And he would stipulate that Tiger Knowles hung the lifeless body of Michael Donald in a tree on Herndon Avenue. I believe I'm quoting you correctly as far as what your stipulation is because I have it written down.
 "That was in order to prevent the video tape which was State's Exhibit Number 1 from coming into evidence. I ruled against [defense counsel] and I allowed State's Exhibit 1 to come into evidence. There was no stipulation by the defendant, by the prosecution to accept those stipulations."
The trial judge denied Cox's motion for judgment of acquittal with the following comment:
 "This matter has been disturbing me anticipating we would ultimately reach this point.
 "Considering all the evidence in this case the court is persuaded by the evidence under Cumbo that it must be viewed in the light most favorable to the prosecution at this stage of the trial. That it is a case purely of circumstantial evidence. Whether or not there should have been more evidence presented by the State or less evidence by the State in this trial is a matter for the State to determine what evidence they are to present.
 "But judging from the evidence that the Court has heard, the Court is of the opinion that th[is] is a matter that the jury is going to determine and the Court will deny your motions."
The trial judge's reference in this comment was to Cumbo v.State, 368 So.2d 871 (Ala.Cr.App. 1978), cert. denied,368 So.2d 877 (Ala. 1979). Recently, in White v. State,546 So.2d 1014 (Ala.Cr.App. 1989), this Court, following Cumbo, again set forth the principles involved in reviewing the sufficiency of the evidence to support a conviction based on circumstantial evidence:
 " 'The standard for appellate review of the sufficiency of the evidence in a case such as this one was aptly set out in Dolvin v. State, 391 So.2d 133 (Ala. 1980):
 " ' " 'In reviewing a conviction based on circumstantial evidence, this court must view that evidence in the light most favorable to the prosecution. The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude. United States v. Black, 497 F.2d 1039 (5th Cir. 1974); United States v. McGlamory, 441 F.2d 130
(5th Cir. 1971); Clark v. United States, 293 F.2d 445 (5th Cir. 1961).
 " ' " '[W]e must keep in mind that the test to be applied is not simply whether in the opinion of the trial judge or the appellate court the evidence fails to exclude every reasonable hypothesis but that of guilt; but rather whether the jury might so conclude. Harper v. United States, 405 F.2d 185 (5th Cir. 1969); Roberts v. United States, 416 F.2d 1216 (5th Cir. 1969). The procedure for appellate review of the sufficiency of the evidence has been aptly set out in Odom v. United States, 377 F.2d 853, 855 (5th Cir. 1967):
 " ' " ' "Our obligation, therefore, is to examine the record to determine whether there is any theory of the evidence from which the jury might have excluded every hypothesis except guilty beyond a reasonable doubt. Rua v. United States, 5 Cir., 1963, 321 F.2d 140; Riggs v. United States, 5 Cir., 1960, 280 F.2d 949. . . . The sanctity of the jury function demands that this court never substitute its decision for that of the jury. Our obligation is to examine the welter of evidence to determine if there exists any reasonable theory from which the jury might have concluded that the defendant was guilty of the crime charged. McGlamory, 441 F.2d at 135 and 136." ' " ' (Emphasis in original). *Page 204 
 " '391 So.2d at 137-38, quoting Cumbo v. State, 368 So.2d 871, 874 (Ala.Crim.App. 1978), cert. denied, Ex parte Cumbo, 368 So.2d 877 (Ala. 1979).' Robinette v. State, 531 So.2d 697, 698-99 (Ala. 1988).* " 'In determining the sufficiency of the evidence to sustain the conviction, this Court must accept as true the evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider the evidence in the light most favorable to the prosecution.' Faircloth v. State, 471 So.2d 485, 489 (Ala.Cr.App. 1984), affirmed, Ex parte Faircloth, 485 So.2d 493 (Ala. 1985).
 " 'This Court must revise and overturn the verdicts of juries "where, in our opinion, after making all proper allowances and indulging all reasonable intendments in favor of the court below, we reach the conclusion that the finding and judgment are wrong." Hunter v. State, 34 Ala. App. 565, 567, 41 So.2d 637 (1949).' Granger v. State, 473 So.2d 1137, 1139 (Ala.Cr.App. 1985).
 " ' "The role of appellate courts is not to say what the facts are. Our role, . . . is to judge whether the evidence is legally sufficient to allow submission of an issue for decision to the jury." Ex parte Bankston, 358 So.2d 1040, 1042 (Ala. 1978). An appellate court may interfere with the jury's verdict only where it reaches "a clear conclusion that the finding and judgment are wrong." Kelly v. State, 273 Ala. 240, 244, 139 So.2d 326 (1962). "The rule is clearly established in this State that a verdict of conviction should not be set aside on the ground of the insufficiency of the evidence to sustain the verdict, unless, after allowing all reasonable presumptions of its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince the court that it was wrong and unjust." Bridges v. State, 284 Ala. 412, 420, 225 So.2d 821 (1969). Even though an appellate court should "marvel that a jury would convict upon such flimsy proof," it is "not permitted to pass upon the weight or sufficiency of the evidence, where it may yield any rational inference of guilt." Toles v. State, 170 Ala. 99, 100, 54 So. 511 (1911). A verdict on conflicting evidence is conclusive on appeal. Roberson v. State, 162 Ala. 30, 50 So. 345
(1909). "[W]here there is ample evidence offered by the state to support a verdict, it should not be overturned even though the evidence offered by the defendant is in sharp conflict therewith and presents a substantial defense." Fuller v. State, 269 Ala. 312, 333, 113 So.2d 153 (1959), cert. denied, Fuller v. Alabama, 361 U.S. 936, 80 S.Ct. 380, 4 L.Ed.2d 358 (1960).' Granger, 473 So.2d at 1139.
 "Where a defendant's conviction is based solely on circumstantial evidence, 'if the circumstances can be reconciled with the theory that someone else may have done the act, then the conviction is due to be reversed.' Ex parte Brown, 499 So.2d 787, 788 (Ala. 1986) (emphasis in original). 'Circumstantial evidence alone is enough to support a guilty verdict of the most heinous crime, provided the jury believes beyond a reasonable doubt that the accused is guilty.' White v. State, 294 Ala. 265, 272, 314 So.2d 857, cert. denied, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975). 'Circumstantial evidence is in nowise considered inferior evidence and is entitled to the same weight as direct evidence provided it points to the guilt of the accused.' Cochran v. State, 500 So.2d 1161, 1177 (Ala.Cr.App. 1984), affirmed in pertinent part, reversed in part on other grounds, Ex parte Cochran, 500 So.2d 1179 (Ala. 1985). 'It is not necessary for a conviction that the defendant be proved guilty to the "exclusion of every possibility of innocence." ' Burks v. State, 117 Ala. 148, 23 So. 530 (1898). 'The facts and circumstances in evidence, if dissevered and disconnected, may be weak and inconclusive; but their probative force, when combined, as it was the province of the jury to combine them, under proper instructions from the court, may have satisfied them of the guilt of the defendant.' Howard v. State, 108 Ala. 571, 18 So. 813, 815 (1895).
 " '[T]here was some evidence from which inferences might have been *Page 205 
drawn by the jury unfavorable to the innocence of the accused. We regard this evidence as weak, inconclusive, and unsatisfactory, and we marvel that a jury would convict upon such flimsy proof. But we are not permitted to pass upon the weight or sufficiency of the evidence, where it may yield any rational inference of guilt.' Toles v. State, 170 Ala. 99, 54 So. 511 (1911).' "
White, 546 So.2d at 1016-1018.
Based on these principles, we find that the evidence in this case is just barely sufficient to support the conviction.
Viewing the evidence in a light most favorable to the state, we find that that evidence affords a reasonable inference that Cox was an accomplice to the murder of Michael Donald. The evidence shows that Cox was a leader in the Ku Klux Klan. This Court can take judicial notice that the Ku Klux Klan "is identified as a violence-prone group with a history of harassing, intimidating, and injuring blacks and members of other minority groups." Marshall v. Bramer, 110 F.R.D. at 235. At a Klan meeting held on Wednesday night — less than 60 hours before Michael Donald's lifeless and abused body was discovered early Saturday morning — Cox openly agreed that if Josephus Anderson "got away" with killing a white police officer, "a white man should be able to get away with killing a nigger" or "a nigger ought to be hung." After the meeting, Cox was overheard speaking the phrase "nigger ought to be hung."
On Friday evening, less than 12 hours before the discovery of the body, Cox assisted Knowles in borrowing a pistol from Johnny Jones. The next day, Cox told Jones not to mention this fact. Cox, accompanied by Knowles and Henry Hays, then went to his mother's house and obtained a rope under the false pretense of using the rope to tow a car belonging to Knowles' mother.
Cox had been with Knowles and Henry Hays a substantial portion of Friday evening and night. Together with Kyser, they built wooden crosses which Cox and Kyser would burn later that Friday night at the courthouse.
The State's evidence on whether the cross burning occurred before or after Michael Donald was hanged is conflicting. There was testimony that tends to indicate that before the cross burning, Henry Hays and Knowles went off together without Cox and that only Hays and Knowles "lynched a black man." However, there was evidence that Cox, Knowles, and Henry Hays left the Hays residence together that Friday night. When they returned around 12:30 Saturday morning, Knowles' shirt was soaked with blood, and Cox offered Knowles a shirt from his car to replace the blood soaked shirt he was wearing.
The testimony in the record indicates that Michael Donald's body was discovered sometime shortly before 4:45 that Saturday morning. The body had been hung from a tree across the street from the residence of Henry Hays. Donald was dead before he was hanged. His throat had been cut. He could have been killed as early as early as 11:45 Friday night, assuming that his body was discovered shortly after it had been hanged.
It is true, as Cox argues, that there is no proof that the rope he got from his mother *Page 206 
was the rope used to hang Michael Donald, or that the pistol he assisted Knowles in obtaining was used to facilitate the murder. There is no proof of where Donald was actually killed or who actually strangled him to death. However, there was evidence that Cox, Henry Hays, and Knowles had the motive, means, and opportunity to commit the murder. The evidence also supplies the reasonable inference that Henry Hays and Knowles actually committed the murder. As this Court recognized inWhite, 546 So.2d at 1018:
 "Here, the State's case against [Cox] is based on weak circumstantial evidence. Both parties to this appeal have relied on essentially the same factual circumstances in arguing [Cox's] guilt and innocence. Each particular circumstance is almost insignificant when isolated and viewed separately. It is only when the individual threads of fact and inference are woven together that the garment of guilt is seen to fit this defendant."
This finding is applicable here. It was paraphrased in the testimony of Mrs. Cox, the appellant's mother. When asked on direct examination if she asked Cox about the rope after she learned of the hanging, she replied, "Yes, I did because it's — With the body being found in front of Henry's apartment and so on, you know, things just kind of clicked together so I asked him the next day when I saw him."
It must be emphasized that the State presented only the very minimum amount of evidence necessary to establish a prima facie case. The circumstantial evidence presented in this case barely rises above the level of suspicion and conjecture. However, despite these weaknesses, the State's evidence does provide a rational inference of guilt. Therefore, the verdict of the jury must be upheld.
The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.
[1] In United States v. Oppenheimer, 242 U.S. 85, 37 S.Ct. 68,61 L.Ed. 161 (1916), the trial court sustained the accused'spre-trial pleas in bar and in abatement on the ground that a former indictment for the identical offense had been determined to be barred by the statute of limitations. The Supreme Court held that because jeopardy had not yet attached at the time of the pre-trial ruling in accused's favor, the Fifth Amendment did not prevent his retrial. However, the Court noted that "one judgment that [accused] is free as a matter of substantive law is as good as another," 242 U.S. at 87, 37 S.Ct. at 69, and determined that principles of res judicata imported from civil proceedings did prevent the retrial. See also State v. Latil,231 La. 551, 92 So.2d 63, 69 (1956).
Oppenheimer rests on principles of res judicata and not on jeopardy. Had Cox been reindicted for conspiracy after the dismissal of his conspiracy indictment, he could have taken advantage of Oppenheimer. Because he was indicted for murder, however, Oppenheimer does not apply. Because it is not a jeopardy case, Oppenheimer provides no answer to the question whether, for purposes of the Fifth Amendment, conspiracy and murder are the "same offense."
[2] We note that, under other circumstances, a codefendant's absence from trial has been argued as ground for a mistrial.Cole v. State, 548 So.2d 629, 630 (Ala.Cr.App. 1989). See alsoGulledge v. State, 526 So.2d 654, 657 (Ala.Cr.App. 1988).
[3] This Court is aware of the extensive civil litigation involving the participants in the murder of Michael Donald. See Judge, KO'ing the Klan: How Morris Dees Used Corporate Law toPunish All The Murderers of Michael Donald, 16 Stud.Lawyer March 1988 at 14. In this opinion, we have made reference to the criminal conviction of Henry Hays for capital murder, Haysv. State, 518 So.2d 749 (Ala.Cr.App. 1985), affirmed in part and reversed in part, 518 So.2d 768 (Ala. 1986), cert. denied,485 U.S. 929, 108 S.Ct. 1099, 99 L.Ed.2d 262 (1988) and to the guilty plea conviction of "Tiger" Knowles for violating the civil rights of Michael Donald, United States v. JamesLlewellyn Knowles, No. CR83-00028 (S.D.Ala.). See Marshall v.Bramer, 110 F.R.D. 232, 237 (W.D.Ky. 1985), affirmed,828 F.2d 355 (6th Cir. 1987). The court reporter's transcript of the trial of the consolidated charges against Cox and Bennie Hays, which resulted in a mistrial, was made a part of the record of the present appeal. However, our affirmance of this appeal is based only on the facts contained in the appellate record filed in this case. Our finding that the evidence is sufficient to support Cox's conviction is "based solely on the facts and evidence presented" at the trial and conviction from which Cox has taken this appeal. Ex parte Cade, 521 So.2d 85, 88 (Ala. 1987), cert. denied, 488 U.S. 871, 109 S.Ct. 184,102 L.E.2d 153 (1988).
[4] On cross-examination of Denise Hays by defense counsel:
 "Q. Frank [Cox] goes home, Teddy [Kyser] goes up and goes to bed [after the cross-burning]?
"A. Yeah.
 "Q. And Henry [Hays] and Tiger [Knowles] leave to go out and lynch a black man. What ultimately happened. Correct?
"A. Yeah."
Similar testimony is found in defense counsel's cross-examination of Teddy Kyser:
 "Q. I'm making a point. When you went and burned a cross you had no idea that Henry Hays and Tiger Knowles had taken Michael Donald from Davis Avenue, killed him, put him in the trunk and brought him out to Herndon Avenue?
"A. No, sir. I done told you three times. I do not."
* "We recognize that the 'hypothesis of innocence' language has been described as 'confusing and incorrect,' and has been abandoned in federal court. Holland v. United States,348 U.S. 121, 139-40, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954) ('There is some support for this type of instruction in the lower court decisions, . . . but the better rule is that where the jury is properly instructed on the standards for reasonable doubt, such an additional instruction on circumstantial evidence is confusing and incorrect.'); United States v. Bell,678 F.2d 547, 549, n. 3 (5th Cir. 1982), affirmed, 462 U.S. 356,103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). 'It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. A jury is free to choose among reasonable constructions of the evidence.'Bell, 678 F.2d at 549. See also United States v. Andrews,765 F.2d 1491, 1500, rehearing denied, 772 F.2d 918 (11th Cir. 1985), cert. denied, Royster v. United States, 474 U.S. 1064,106 S.Ct. 815, 88 L.Ed.2d 789 (1986). Despite this, the 'hypothesis of innocence' language is still employed by the courts of this state. Robinette, supra; Cobb v. State,495 So.2d 705 (Ala. 1985) (rejecting 'all reasonable doubt' in favor of 'a reasonable doubt')."